7331

### NORRIS v. SOUTHERN RY.—CAROLINA DIVISION.

1. RAILROADS—NEGROES.—When the coach on a train of cars prepared for negroes will not accommodate them and another coach cannot then be procured, the conductor may assign a portion of a white coach to them.

2. RAILROADS—PASSENGER.—The rule that it is the duty of a carrier to use the highest degree of care to protect a passenger from a wrong or injury from a fellow-passenger, applies only when the carrier has knowledge of the existence of the danger or of facts and circumstances from which the danger may be reasonably anticipated.

3. DAMAGES—MENTAL SUFFERING.—No recovery for mental suffering in the absence of bodily injury is permissible except under the mental anguish statute.

Before WATTS, J., Barnwell, Winter term, 1909. Affirmed.

Action by Julia A. and Benjamin Norris against the Southern Railway—Carolina Division. From order of nonsuit, plaintiff appeals.

*Mr. C. A. Best,* for appellant, cites: 74 S. C., 332; 78 S. C., 552; 6 Ency., 602; 31 L. R. A., 551; 17 L. R. A., 571; 38 L. R. A., 427; 16 L. R. A., 627; 5 Ency., 533; 3 Thomp. on Neg., 544; Hutch. on Car., sec. 548; 17 Am. R., 504; 21 A. & E. R. R., 428; 28 Id., 398; Moore on Car., 426.

*Mr. J. Emile Harley,* contra, cites: 78 S. C., 552; 52 S. C., 323; 27 S. C., 325; 74 S. C., 332; 93 N. Y., 127; 16 L. R. A., 630; 105 U. S., 252; 140 Mo., 683; Ray. Neg., 133-4; Webb-Pollock Torts, 45-7; 47 L. R. A., 123; 53 Miss., 200; 6 Cyc., 602; 5 Ency., 553; 93 Va., 44; 2 A. & E. R. R. Cas., 441; 87 Mo., 417; 32 L. R. A., 794; 67 Miss., 376; 38 L. R. A., 431; 30 S. C., 218; 77 S. C., 436.

October 21, 1909. The opinion of the Court was delivered by

Mr. Chief Justice Jones. The appeal is from an order of nonsuit.

The delict of the defendant was alleged in the complaint, as follows:

3. "That upon the passenger car upon which the plaintiff, Julia A. Norris, was a passenger, the agents and servants in charge of said train, on the line of said defendant railroad, caused a number of negroes to be seated in said car near the plaintiff, who were very disorderly, committing breaches of the peace, using threatening speeches, profane language, and were otherwise disorderly, much to the annoyance and humiliation of the said plaintiff, Julia A. Norris, she being a white lady, and in the white coach of said car; causing her to become frightened, greatly humiliating her in her feelings, subjecting and requiring her to be in the presence of said disorderly and rowdy negroes, as aforesaid; all of which greatly shocked the nervous system of the said plaintiff, Julia A. Norris, causing her to suffer, and continue to suffer, in body and in mind.

4. "That the action of the said defendant company, its agents and servants, was wilful, wanton, reckless, careless and unlawful, the said conductor in no way attempting to prevent the trouble heretofore complained of, notwithstanding the fact that he knew, or should have known, of the existence of the same; and, further, that the said conductor caused and required the said plaintiff, Julia A. Norris, to be

seated in the extreme rear end of the said passenger car, and required her to alight from said end, thereby giving to the said negroes upon board of the said car a preference of the comforts and conveniences thereon, in preference to the said plaintiff, Julia A. Norris, when the said defendant knew, or should have known, that it was its duty in the premises to furnish and maintain a separate coach for carriage of the said negroes."

The testimony for plaintiff tended to show that on Saturday, November 28, 1908, plaintiff boarded defendant's passenger train at Yenome, in Barnwell county, as a passenger for Barnwell, S. C., a distance of four or five miles. This train had two passenger coaches, one for white and one for colored people.

At this time there was a carnival going on at Barnwell. When the train reached Yenome the passenger coach for negroes was full, and a number of negroes boarding the train there entered the front part of the passenger coach for whites, which had been assigned to negroes, so that the coach was about half full, leaving the rear end of that coach for white passengers. When the plaintiff boarded the train she was assisted by the brakeman, and, entering the front end of the coach for white passengers, she was told by the conductor to take a seat in the rear end of the coach. The plaintiff was accompanied by her friend, Reuben Jacobs. When the train arrived at Barnwell the conductor advised plaintiff and her friend to get off at the rear end of the coach, in order to avoid the crowd of negroes. With respect to the conduct of the negro passengers, plaintiff testified that "they were drinking whiskey and using profane language." "When they got on the train they went to frolicking and cursing, and going on." "They were at it before they got on the train, and afterwards, and all the time." On this point Reuben Jacobs testified: "They seemed to be drinking." "They were cursing, and one I saw had a bottle in his hand. What was in the bottle, I don't know." When asked to state what was said by the negroes, he testified:

"A negro, sitting just behind this one with the whiskey, says: 'I will split your brains out with my bottle, you —— —— son of a bitch.' " That this kind of conduct "continued all the way to Barnwell." The negro he heard cursing was "about the second seat from the front of the coach." Both these witnesses testified the conductor did nothing to prevent the said conduct of the negroes. The conductor took up plaintiff's ticket immediately after the train started, and was laughing.

Plaintiff testified that the conductor was there and knew of the conduct of the passengers, but on cross-examination stated that she did not see the conductor after he took her ticket, and did not know where he went. Reuben Jacobs testified that the conductor was "just to my back;" "did not know exactly how many feet he was from me" when he, witness, heard the negro say: "I will split your brains out with my bottle," etc.

As to the effect this conduct had on plaintiff, she testified that she "became nervous;" she said: "I have heart trouble, and I was very nervous, and I did not sleep any that night." Reuben Jacobs testified: "She seemed to get very nervous, and asked me to raise the sash so that she could get some air." The husband of the plaintiff, W. B. Norris, testified that when he met his wife at the Barnwell station "she did not look exactly right; seemed like she was worried." When asked if she was nervous, he said yes, and stated, further, "I told her not to be worried about it; and we would see about it, if there was any law."

We think the nonsuit was proper.

1. The evidence did not tend to show any breach of duty by defendant in having white and colored passengers in the same coach, as section 2161, Code of Laws, provides: "In case the coach for either white or colored passengers should be full of passengers, and another coach cannot be procured at the time, then the conductor in charge of the said train shall be, and he is hereby, author-

ized to set apart so much of the other coach as may be necessary to accommodate the passengers on said train."

There was evidence that the coach for colored passengers was full, and, in view of the circumstances the reasonable inference is that another coach could not be procured at the time.

2. The rule, that it is the duty of a carrier to use the highest degree of care to protect a passenger from the wrong or injury of a fellow-passenger, applies only when the carrier has knowledge of the existence of the danger, or of facts and circumstances from which the danger may be reasonably anticipated. *Franklin* v. *Railway Co.,* 74 S. C., 340, 54 S. E., 578; *Anderson* v. *Railway Co.,* 77 S. C., 436, 58 S. E., 149.

In *Franklin* v. *Railway Co., supra,* the Court, speaking through Associate Justice Woods, said: "But there are factors which enter into the practical application of the rule of the highest degree of care to the protection of passengers from improper conduct of fellow-passengers, which are not present in its application to the carrier's mechanical agencies and its servants. Due regard to known mechanical laws, and the selection of employees, are matters within the control of the carrier; but a carrier has only a limited control over passengers on its trains. It has no right to direct their actions, so long as they do not conflict with its rules, reasonably necessary for the conduct of its business, or with the correlative rights of the other passengers. Indeed, interference on the part of a conductor with free communication between passengers will be generally regarded as impertinent by those concerned, except when there is a clear violation of the rules of good behavior by one passenger to the annoyance of others. When that moment comes, it is obviously the duty of the conductor to act; but to know the moment until complaint is made by the passenger of annoyance is often extremely difficult. Ordinarily any unwelcome advances by one passenger to another may be effectively rebuffed by the passenger himself. In

applying the highest degree of care to this duty of protection by the conductor, it is further to be borne in mind that good conduct and respect among passengers is the rule, and insult and wrong extremely rare, and that experience has shown that the other duties of a conductor, requiring his absence from the car from time to time, may ordinarily be performed without risk of injury of one passenger to another in his absence. Hence, it cannot be laid down as a general proposition that the exercise of the highest degree of care for the protection of passengers from each other requires that the carrier should keep a watch over the passengers on its train, except over those from whom it has a reason to anticipate improper behavior."

There was nothing to show that when the negroes boarded the train at Yenome their condition or conduct was such as made it the duty of the conductor to refuse to allow them to come aboard as passengers. After they were in the car, as passengers, no one made any complaint to the conductor as to the disorderly conduct, and there was no evidence that the conductor, or any employee of defendant, knew, or by the existence of the highest degree of care should have known, that the conduct of the fellow-passengers was so improper as to interfere with the safety or reasonable comfort of the plaintiff and other passengers. The evidence does not show that any violence, personal indignity, threat or insult, was put upon plaintiff by any fellow-passenger. There was evidence tending to show that plaintiff was excited, or frightened, by being in the same coach with negroes, who were, as she said, "drinking and cursing." There is no evidence that she saw and heard the particular instance of disorderly and indecent conduct, mentioned by Reuben Jacobs; but, what is more to the point, there was no evidence that the conductor saw or heard it, he being farther removed from the spot than the witness, and, even if in the same car, was busily engaged in lifting many fares on a crowded train during the brief run of four or five miles between stations. It was said the conductor was

laughing when he took up the fares of plaintiff and her friend. This does not tend to show any wilful or negligent breach of duty to plaintiff, but rather that if the conductor had observed the conduct of the fellow-passengers he saw nothing beyond the noisy frolicsomeness and guffaw of negroes on a holiday excursion. It is certain that the conductor was not aware, and not informed, that the sensibility of any passenger was being unreasonably offended.

But even if it be conceded that in all this there was some evidence of a breach of the carrier's obligation to provide for the safety and reasonable comfort of a passenger, the evidence fails to show that the plaintiff sustained any bodily suffering or discomfort, not the result of the "heart trouble" she stated she had, as to which the conductor does not appear to have had knowledge. The law in this State does not allow recovery of damages for mental suffering in the absence of bodily injury, except under the mental anguish statutes with reference to telegraph companies. *Mack* v. *R. R. Co.*, 52 S. C., 326, 29 S. E., 905; *Lewis* v. *Tel. Co.*, 57 S. C., 330, 35 S. E., 556; *Taylor* v. *R. R. Co.*, 78 S. C., 559, 59 S. E., 641.

The judgment of the Circuit Court is affirmed.