## 11987

### SHEPHERD v. SOUTHERN RAILWAY CO.

#### (133 S. E., 231)

1. CARRIERS—CARRIER HAS DUTY THROUGH THOSE AUTHORIZED TO SELL TICKETS TO GIVE PASSENGERS NECESSARY INSTRUCTIONS AND INFORMATION FOR PURSUING JOURNEY, AND PASSENGER HAS RIGHT TO RELY THEREON.—It is duty of carrier through those authorized to sell tickets to give passengers instructions and information necessary for them to pursue their journey in comfort and safety and with dispatch, and passenger has right to rely on such instructions and information.

2. CARRIERS.—Passenger, before boarding train, should use due diligence to ascertain if it stops at his destination.

3. CARRIERS—TICKET AGENT HAVING IN RESPONSE TO INQUIRY CORRECTLY INFORMED PASSENGER AS TO TIME TRAIN LEFT AND THAT IT WAS THEN ON TRACK DID NOT MISLEAD PASSENGER, THOUGH IN FACT HE BOARDED ANOTHER TRAIN WHICH WAS ALSO ON TRACK AT THAT TIME.—Where ticket agent, in response to inquiry, correctly informed passenger that train left at 12:45 and was then on track, *held* that passenger was not misled thereby though he in fact boarded the wrong train, which was also on track at same time, since passenger by use of care could have ascertained location of proper train.

4. CARRIERS—RAILROADS HAVE RIGHT TO RUN TRAINS STOPPING ONLY AT IMPORTANT STATIONS WITH DUTY TO PROVIDE REASONABLE MEANS TO INFORM PASSENGERS AS TO PROPER TRAIN TO TAKE.—Railroads have right to run trains stopping only at important station, and railroad must provide reasonable means by which passenger may be informed as to proper train for him to take.

5. CARRIERS—CONDUCTOR'S CONDUCT IN PERMITTING PASSENGER TO TAKE THROUGH TRAIN CANNOT BE REGARDED AS WILLFUL, IN ABSENCE OF EVIDENCE SHOWING THAT HE WILLFULLY PERMITTED PASSENGER TO TAKE SUCH TRAIN INSTEAD OF LOCAL.—Conduct of conductor of through train in permitting passenger to board train without knowledge that he wished to stop at intermediate point, at which train did not stop, cannot be regarded as willful, in absence of evidence that he willfully permitted passenger to take such train instead of local.

6. CARRIERS.—Though railroad has duty to exercise ordinary care to see that passenger takes proper train, passenger likewise has duty to exercise due care in such respect.

NOTE: As to liability of carrier on account of misdirection of a passenger by an employee, see note in 24 L. R. A. (N. S.), 1178.

7. CARRIERS—PASSENGER, HAVING BOARDED WRONG TRAIN, AFTER BEING INFORMED THAT TRAIN WAS ON TRACK BY TICKET AGENT WITHOUT INQUIRY FROM CONDUCTOR, HELD TO HAVE BROUGHT ABOUT INCONVENIENCE BY FAILURE TO USE DUE DILIGENCE, PRECLUDING RECOVERY AGAINST RAILROAD.—Where passenger, after being informed by ticket agent that train was on track, boarded the wrong train without making any inquiry from conductor, *held* that his negligence in failing to use due diligence was proximate contributing cause of his inconvenience brought about thereby, precluding recovery against railroad.

8. CARRIERS.—Passenger cannot recover for alleged improper acts of conductor, in absence of bodily injury.

9. CARRIERS.—Act of conductor in refusing to stop through train for passenger who had boarded wrong train is not actionable.

Before WILSON, J., Greenville, November, 1924. Revised and remanded, with directions. Action by William Shepherd against the Southern Railway Company Judgment for plaintiff, and defendant appeals.

*Messrs. Frank G. Tompkins* and *Bonham, Price & Poag* for appellant, *cite: Right of railroad company to operate through trains:* 75 S. C., 360. *Agent only required to give correct information to passengers:* 79 S. E., 91; 90 S. C., 510. *Duty of passenger to inquire about trains:* 75 S. C., 360. *Conduct of conductor:* 109 S. C., 95. *Recovery of damage for mental suffering dependent on bodily injury:* 84 S. C., 21; 82 S. C., 481; 78 S. C., 559.

*Mr J. Robt. Martin,* for respondent Cites: *Case distinguished:* 75 S. C., 360. *Facts of this case governed by following:* 79 S. C., 151; 75 S. C., 444; 75 S. C., 144; 53 S. C., 210; 35 S. C., 499. *Duty of agent to give passenger full information:* 90 S. C., 507; 89 S. C., 436; 88 S. C., 421; 75 S. C., 144; 52 S. C., 213. *Duty of conductor to heed explanations:* 111 S. C., 405; 88 S. C., 421. *Failure to stop at station named on ticket negligence:* 130 S. C., 368; 83 S. C., 68; 77 S. C., 377; 61 S. C., 357; 56 S. C., 93. *Through trains bound to stop under certain circumstances:* 79 S. C., 273; 72 S. C., 136. *Rule of company subordinate to passenger's rights* 71 S. C., 448; 53 S. C., 213. *Worry*

*of passenger to be considered in awarding damages:* 83
S. C., 415; 76 S. C., 493; 73 S. C., 272; 72 S. C., 442.
*Punitive damages:* 89 S. C., 436; 89 S. C., 35; 88 S. C.,
421; 79 S. C., 151; 71 S. C., 444; 54 S. C., 499; 53 S. C.,
213.

May 14, 1926.

The opinion of the Court was delivered by MR. ACTING
ASSOCIATE JUSTICE R. O. PURDY.

The respondent, desiring to have a sick child treated by
a physician who lived at Greer, which is a station between
Greenville and Spartanburg, on September 15, 1923, pur-
chased a ticket for Greer from the appellant's agent at
Greenville. The respondent at the time had the child in
his arms. He boarded the appellant's train, No. 34, which
was a through train and carried him beyond Greer to
Spartanburg. No. 12, a local train which stopped at Greer,
was in the yard at Greenville at the same time.

This action was brought for actual and punitive damages
for failure to permit the respondent to get off the train at
Greer. The complaint alleges the purchase of a ticket, and
alleges, further, that the appellant knew of the importance
of the respondent's mission, and that the appellant's serv-
ants in charge of the train negligently, recklessly, and
heedlessly carried the respondent beyond his destination,
over his protest, causing him to expend extra money for his
transportation from Spartanburg back to Greer, and causing
him humiliation, mental worry, and anxiety for the sick child
which he was carrying to Greer for medical attention—all to
his damage in the sum of $2,999.

The appellant filed a general denial, and in addition
claimed that the respondent was guilty of contributory
negligence in that, if he sustained any injury at all, it was due
to his own contributory negligent, reckless, and heedless con-
duct in boarding the train in question without making any
inquiry whether the train would stop at Greer, and that such

conduct on the part of the respondent, contributing with the acts of the appellant, brought about this injury.

The case came on to be heard before his Honor, Judge Wilson. At the close of the respondent's testmony, the appellant's attorneys moved for a nonsuit upon the ground that there was a total failure of proof of negligence, and that there was not any evidence of recklessness or willfulness on the part of the appellant. This motion was denied.

Upon the close of all of the testimony, the appellant made a motion for a directed verdict upon practically the same grounds as are embraced in the motion for a nonsuit, and also asked for a direction of verdict as to all damages alleged as growing out of humiliation, anxiety, and mental worry, and that in any event, if the case should be sent to the jury, the jury be instructed that they could only find damages for the amount of money the defendant expended in getting back to Greer.

The motion was denied, and the case submitted to the jury, who found a verdict for 64 cents, actual damages, and $130 punitive damages, and the defendant has appealed, alleging errors: (1) In not granting a nonsuit as to both actual and punitive damages; (2) in not directing a verdict; and (3) in not instructing the jury that they could only find the sum of 64 cents, the actual amount of the fare paid back to Greer.

An examination of the testimony shows that the respondent applied to the agent at the station for a ticket. He testified:

"I went in, carrying the baby in my arms. I went to the ticket agent. I said, "When is the next train due for Greer?' He said, '12:45; it is out there now.' I says, 'Give me a ticket.' I was in a hurry to get on the train before it pulled out."

"Q. Could you see the train? A. Yes, sir; on the first track.

"Q. Well, now; when you went out just tell what you did. A. The conductor was standing there letting the passengers on, and I went on and got on the train and went on.

"Q. How close was he to you when you got on the train? Was the man dressed in uniform?   A.   He was standing right where I could put my hands on him.

"Q. Did he ask you anything?   A.  No, sir.

"Q. Did you ask him anything?   A.  No, sir.

"Q. Did you see any other train there?   A.  No, sir.

"Q. You had already gotten the information from the ticket man that the train was in the yard?   A.  Yes, sir."

Respondent took a seat in the day coach and stated that:

The conductor approached him for his ticket. "He come along.   I handed him my ticket; he says, 'What did you get on this train for?'   I didn't know what was the matter.   I said, 'To take my baby to the doctor at Greer.'   He said, 'This train don't stop there; so the time I was talking the baby was crying, and I told him, 'I would like to get off, if you please. · He said, 'You can't get off there; this train don't stop there; it don't stop until we get to Spartanburg.'

"Q. Did you give him any information of why you took that train?   A. Yes, sir;   I told him the ticket agent sold me a ticket and told me the train was out there.   He says, 'He can sell you a ticket, but he had no business; I will learn you what train to get on,' and went on off.   At the time he was talking to me the baby was crying.   He took the ticket.   Some fellow right behind me there was to get off at Gastonia, the ticket called for Gastonia; he says, 'You can fall off at Spartanburg too; you can catch the train behind it'; and he went on off and I didn't see him any more until I got to Spartanburg.

"Q. Did he make a stop at Greer?   A.  No, sir.

"Q. Did he come back and say anything about you and your sick baby?   A.  No, sir.

"Q. Where did you next see the conductor of that train? A.   Spartanburg.

"Q. What did he do in Spartanburg, if any thing?   A. He come up to me and give me a hat check with a pass on .it, says, 'You can ride back tonight at 7:55.'   I says, 'It

would not be any use to me to get back to Greer at that time; I don't think he would be at home then.' He says, 'That's bad, best I can do for you'; so I took my baby and carried him from the Southern depot to the P. & N."

Respondent added that he got to Greer at 4:30 that afternoon, saw the doctor, and got home that night. He said, in answer as to how he was treated by the conductor: "Well, he acted like he was mad because I got on that train." He said further, that the baby fretted all the way there and back, and the conductor could see that it was a sick child. He said that the conductor wrote on the back of a hat check and gave it to him, "Conductor 45. Please take this party back to Greer. Signed, Zachery, 34."

Respondent says that he did not know that there was another train in the yard at the time that he got on No. 34. After that, in visiting the station, he found that there was a local train known as No. 16 which was in the yard at the time, and which would have stopped at Greer. This train left Greenville about 15 minutes after No. 34. He said, further, that the train which he boarded was a long train with Pullman cars and obstructed the view of the local train. He said that he took the P. & N. train from Spartanburg, and the testimony tends to show that he left Spartanburg at 2:20 and should have gotten to Greer at 2:59, but respondent testified that the train broke down, and that he did not get to Greer until 4:30.

Conductor Zachery, in charge of the through train, testified: That the train did not stop at Greer. That he asked the respondent why he got on the train, and he said, "They sold me a ticket on this train." After going through the train, and after passing Greer, he saw the respondent again, and told him he would give him a note so that he could get back to Greer on the next train. He did not know when he found out that he was taking a sick child to the doctor at Greer. He thought it was necessary for respondent to get back as soon as he could, and told him at Spartanburg that

the P. & S. left there in a few minutes, and noticing his worried condition, told him he would pay his fare back on the P. & N., and offered him a dollar, which respondent refused to take, saying he had money to pay his fare.

Train No. 16, formerly known as train No. 12 ,has been running through Greenville for a great many years. He was familiar with the rules of the railroad relating to his duties to the effect, "They must see, as far as practicable that parties have proper transportation before entering the train." Under the schedule and rules of the company, this other train did not make a stop at Greer, and the first knowledge that Conductor Zachery had that the respondent was on the train was when he, the conductor, passed through the train collecting transportation and the respondent handed him a ticket for Greer. The conductor said that he had no occasion to make the remark to the respondent, "How come you to get on this train," and does not remember that the respondent talked to him about the child, but he stated, "He seemed to be pretty indignant."

Mr. Knight, a flagman on train No. 34, testified: He had been in the service of the company for 12 years, and lived in Greenville for 17 years; that this particular train had been on for about 6 months, and that he recalled the occasion out of which this suit grew. On that occasion, he said:

He was standing at the front end of the firstclass car, the day coach. That he called, "Train 34, first stop Spartanburg"; then called "Spartanburg, Gastonia and Charlotte." He said he remembered the respondent as having a little child but no lady, or as he expressed it. "He had a little child going on, and I remembered him very well on account there was no lady or nothing with him; I naturally noticed that." "I called out that Spartanburg was the first stop that we made." He said if he had been asked by the respondent, he would have told him that the train did not stop at Greer. He did not talk with respondent. He was asked if "on all these big trains that you run, when they go to get on 38 and

29 and 36, it is customary to find out when he is getting on the day coach where he is going. A. Yes, sir.

"Q. But as a matter of fact, at the stations before or when the train runs in, somebody announces that in the depot or at the platform to check them up when they go to get on the train; that's the place that the conductor says 'Hey; where are you going? or 'Let's see your ticket.' A. Yes, sir.

"Q. And hasn't that been the custom ever since you have lived in Atlanta and before you went to Atlanta on the big train? A. Yes. sir.

"Q. This time you did not take up the tickets? A. I didn't demand no ticket.

"Q. You didn't ask the man, 'are you going to Spartanburg,' or anything, did you? A. No; I called out.

"Q. I understand you said that you hollered it out, 'Spartanburg, Gastonia, and Charlotte.' It would take very little time, just as they file on, to say, 'Ma'am, where are you going? I beg your pardon; Where are you going? That would be practicable wouldn't it? A. Oh, yes"

The respondent, in reply, stated that the conductor found out that he had a sick child when he took up the ticket. He said that Mr. Zachery was the man at the place when he got on the train, and that the train stayed only a minute or so after he got on, and that he did not notice any one behind him, and that "Spartanburg, Gastonia, and Charlotte" were not called out in his hearing by anybody. On cross-examination, he stated that he saw a railroad man with a cap, a man that he had never seen before; that he had on the uniform; and that he did not make any inquiry as to where the train stopped that he was going on.

The testimony is not voluminous, yet we have not undertaken to quote it at length, but we think we have quoted the material parts of it as bearing on the issues.

The case will be disposed of and is governed by the conduct: (1) Of the ticket agent; (2) of the conductor and flagman; and (3) of the respondent.

"It is the duty of a carrier through those whom it has authorized to sell tickets over its lines, to give its passengers such instructions and information as may be necessary for them to pursue their journey in comfort and safety and with dispatch, and the passenger has the right to rely upon the instructions and information given by such agents, acting within the scope or apparent scope of their authority." *Smith v. Railway,* 88 S. C., 421; 70 S. E., 1057; 34 L. R. A. (N. S.), 708; *Gillman v. Railroad,* 53 S. C., 210; 31 S. E., 224.

1. It is evident from the testimony that the agent who sold the ticket knew that there were two trains in the yard, and knew that the other train, No. 34, was between the door of the ticket office and the local train, and that the view of the local train was obstructed by train 34. This, we think, is fair inference from the testimony. He was asked by the respondent, "When is the next train due for Greer," and said, "12:45." He said, "It is out there now." It will thus be noted that the ticket agent gave the correct information sought. He did not go further and direct him on what track the train for Greer would be found. There was nothing in the conduct of the respondent to indicate that he would not use such means as would be furnished him in the yard to enable him to take the right train.

In *Carter v. Southern Railway Co.,* 75 S. C., 360; 55 S. E., 771 (cited also in *Black v. Railway,* 82 S. C., 478; 64 S. E., 418), the Court says: .

It "is the duty of a passenger before boarding a train to use due diligence to ascertain if it stops at his destination, and if the passenger fails to use the means of information at his command he cannot complain of the resulting inconvenience or damage, even if on his refusal to pay the additional fare to the next regular stopping place he is ejected from the train."

See, also, *Bradley v. Railroad* Co., 99 S. C., 78; 82 L. Ed., 1009, Ann. Cas. 1916E, 1219.

The Court of Appeals in Georgia, in the case of *Johnson v. Seaboard Air Line Railway,* 13 Ga. App. 298; 79 S. E., 91, holds:

"It is no part of the ticket agent's duty to follow passengers up to see that they do not get on the wrong train. His business is in the ticket office, and his duty, so far as passengers are concerned, is ended when he furnishes the means of transportation and gives such information in connection with its use as is necessary to enable the pasasenger to properly use the ticket. If he is applied to for information in reference to schedules, or as to the particular train which the passenger ought to take, it is his duty to give the necessary information; but it is not his duty to volunteer information in reference to these matters to all passengers who apply for tickets, in the absence of some intimation that the information is desired."

His Honor charged the jury, at the request of the defendant:

"It is the duty of a passenger to inquire whether a train on which he intends to ride will stop at the station to which he desires to go, and if the train does not stop he cannot require the employees of the railroad to stop there."

While this became the law of this particular case, 2, 3   so far as the trial in the Circuit Court is concerned, this Court has never gone so far as to lay down the absolute rule that it is the duty of a passenger to inquire whether the train on which he intends to ride will stop at the station to which he intends to go. An adherence to this rule might in some instances require a prospective passenger to forego his journey or be left by the train, if he could find no one of whom he could inquire. The true rule is laid down in the *Carter Case, supra,* to the effect that a passenger before boarding a train should use due diligence to ascertain if it stops at his destination. The respondent was in no way misled by the ticket agent, who responded correctly to the inquiries propounded, and told the respondent that the train

was in the yard.   Had the ticket agent simply said "12:45" and added nothing more, he would have fully answered the inquiry of the respondent, and adding that the train was already in the yard could in no wise mislead him, for if he had used the slightest care he could have ascertained the location of the train on which he desired to become a passenger.

2. As to the conduct of the conductor and the brakeman: it was the duty of the conductor, as far as practicable, under the rules of the company, to give information to those intending to board its train.   The testimony does not disclose that any question was asked by the respondent, or that any information was given him by the conductor or by the brakeman, except that the brakeman states that he called out that the first stop of the train was Spartanburg and continued to call "Spartanburg, Gastonia, and Charlotte."   By some means the respondent got on the train without any positive notice that he was boarding a train that did not stop at Greer, and without taking any precautions to ascertain that fact.   It does not appear that the respondent was an experienced traveler and had notice from the character of the train that it was not a local train, although the testimony shows that he had frequently seen trains in the yard and passing through the yard at Greenville.   The presence of the Pullman cars and the length of the train would indicate to a person in any way accustomed to traveling that it was not a local train.

Railroads have a right to run their trains stopping only at important stations, and it is the duty of a railroad company to provide reasonable means by which a passenger may be informed as to the proper train for him to take.   *Carter v. Railway Co.*, 75 S. C., 355; 55 S. E., 771.   There is not any dispute about the fact that train No. 34, which the respondent boarded, was a through train, with its next stop at Spartanburg, and it is not disputed that the railroad furnished the means by which the respondent could have been informed whether he should have taken this

7—S. C.—135.

train. The respondent, referring to the conductor, says when he went to get on the train, "he was standing right where I could put my hand on him"; and there is not any dispute about the facts that the conductor did not tell him not to take this train, and that he did not ask the conductor whether it was the train that he should take.

This conduct on the part of the conductor cannot be regarded as willful, because there is not any evidence tending to show that he willfully permitted the respondent to take this train instead of the local train; and if the conductor was negligent, the respondent was likewise negligent.

3. While it was the duty of the appellant to exercise ordinary care in order to see that the respondent took the proper train to carry him to his destination, it was likewise the duty of the respondent to exercise due care in this respect. There is not any testimony tending to show that there was any willfulness on the part of the conductor, the ticket agent, or the flagman. If there was any negligence on the part of any of these three persons in not taking the proper precautions to notify the respondent not to get on train No. 34, the respondent was likewise negligent in not using due diligence to protect himself and to prevent the occurrence which took place, and such negligence of the respondent brought about his inconvenience as the proximate contributing cause of it.

The respondent could not recover for the acts of the conductor complained of, in the absence of bodily injury, and besides the acts of the conductor on the train, as sought to be proven by the respondent, are not actionable. *Taylor v. Railroad Co.,* 78 S. C., 559; 59 S. E., 641; *Norris v. Southern Railway,* 84 S. C., 21; 65 S. E., 956; *Black v. Atlantic Coast Line R. Co.,* 82 S. C., 481; 64 S. E., 418.

Therefore his Honor, the Circuit Judge, should have directed a verdict in favor of the defendant. The judgment

of the Circuit Court is reversed, and the case is remanded to that Court, with instruction to the clerk to enter up judgment under Rule 27 in favor of the defendant.

MESSRS. JUSTICES WATTS, COTHRAN, BLEASE and STABLER concur.

MR. CHIEF JUSTICE GARY did not participate.