**Debora HANBACK, Plaintiff,**

v.

**SEABOARD COASTLINE RAILROAD (a corporation) and National Railroad Passenger Service, Defendants.**

Civ. A. No. 73–1486.

United States District Court,
D. South Carolina,
Florence Division.
May 29, 1975.

Reginald C. Brown, Hyman, Morgan & Brown, Florence, S. C., for plaintiff.

C. Weston Houck, Florence, S. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHAPMAN, District Judge.

This matter was tried before the Court without a jury on May 13 and 14, 1975. Plaintiff alleges she was assaulted and raped by another passenger on Seaboard Coastline Railroad train No. 83 near Florence, South Carolina, on June 3, 1972, and asserts that defendants failed to provide the highest degree of care to protect her from such attack and thereby violated its duty to her as a paying passenger.

The answer sets up the defenses of contributory negligence, assumption of risk and the intervening act of the plaintiff's assailant make any negligence or breach of duty by the defendant remote and not a proximate cause of plaintiff's injuries and damages.

The Court has weighed the testimony and evidence presented at the trial, reviewed the exhibits introduced into evidence and studied the applicable law. Now in accordance with Rule 52, Federal Rules of Civil Procedure, it makes the following

### FINDINGS OF FACT

1. The plaintiff Debora Hanback, now Debora Hanback Roberts, having been married on December 28, 1974, boarded the passenger train No. 83 of Seaboard Coastline Railroad in Alexandria, Virginia at approximately 7:30 p. m. on June 2, 1972. This train ran from New York City to Miami, Florida and plaintiff, then being 18 years of age, had purchased a ticket from Alexandria to Fort Lauderdale, Florida, where she intended to spend the summer working in the area and living with her great aunt. She had completed one year of college at the time, and was undecided as to whether she would return to college in the fall or work for a year and then return.

2. At the time the incident occurred plaintiff was a resident of the State of Virginia and at the time the action was commenced she was a citizen and resident of the State of North Carolina.

3. The defendant Seaboard Coastline is a corporation organized and existing under the laws of a state other than South Carolina and does business in

South Carolina, owns railroad track and equipment and operates freight and passenger trains in and through the State of South Carolina.

The defendant, National Railroad Passenger Corporation, commonly referred to as Amtrak, was created under an Act of Congress (45 U.S.C.A. 541 et seq.) which provides in part:

". . . The Corporation shall be a for profit corporation, the purpose of which shall be to provide intercity rail passenger service, employing innovative operating and marketing concepts so as to fully develop the potential of modern rail service in meeting the nation's intercity passenger transportation requirements. The Corporation will not be an agency or establishment of the United States Government. It shall be subject to the provisions of this chapter and, to the extent consistent with this chapter, to the District of Columbia Business Corporation Act."

Amtrak is deemed a common carrier by railroad and subject to the Interstate Commerce Act, with certain exceptions. 45 U.S.C. § 546.

4. At the time of the assault upon the plaintiff Seaboard Coastline Railroad Company had eight employees and defendant Amtrak had one employee on train No. 83. The one Amtrak employee was Kathy Rowlette, a passenger service representative, who boarded the train in New York. She was responsible for the comfort and entertainment of passengers and also for explaining to them the purpose of and services provided by Amtrak.

5. Plaintiff had purchased a ticket for one of the reserved seat coaches. After boarding the train and finding her seat, she conversed for a while with a female passenger seated next to her. This was plaintiff's first trip on a train and she was not familiar with the various facilities offered by the train.

6. An hour or so after boarding the train the woman next to her advised that she was going to the lounge or club car and offered to bring plaintiff a beer or other beverage. Plaintiff accepted this hospitality and shortly after finishing the beer, she decided to find the club car. Upon arriving at the club car, she found it was crowded with various passengers, including a number of soldiers in the Army Reserve or National Guard, who were returning to Florida after an encampment of two week at Fort Eustis, Virginia. Four sleeping cars, housing the soldiers, had been added to the train in Petersburg, Virginia. These four coaches were at the rear of the train. The adding of such coaches and transporting of military personnel was a common occurrence on the railroad, and in the past, had created no unusual problems relating to the discipline and behavior of such military personnel.

7. The plaintiff joined in conversations with various groups, including several soldiers, who were enjoying the atmosphere and beverages purchased from the bartender in the car. Among the soldiers present in the club car and conversing with the plaintiff from time to time were Guy Register and Joseph Reyna. Plaintiff had not known either of these soldiers prior to entering the club car.

8. Some time prior to midnight, plaintiff left the lounge car and returned to her seat in order to change from a double knit dress to "hip hugger" bluejeans with a halter top. This outfit left a great deal of the plaintiff's midsection exposed, from the bottom of her halter, just a few inches below her breasts, to the top of her bluejeans, which rode on her hips about four inches below her navel.

9. After this change, she returned to the club car where she remained until the bartender discontinued the sale of drinks at midnight. The bartender then left the lounge car and went to his sleeping quarters in another car in the forward section of the train.

10. The plaintiff remained in the club car and some of the soldiers

brought some of their own whiskey to the car and served it to those present. During this time the population in the car reduced to about six persons. During the evening the plaintiff admitted that she had had approximately three beers and one drink of whiskey after the bar had closed.

11. During the evening Joseph Reyna consumed seven drinks from the bar. These were one and a half ounce drinks served in the customary "mini-bottle". Some of these drinks were purchased by Reyna and others were purchased by soldiers who would go to the bar and buy a number of drinks for a group of passengers that might be sitting together. During this time Reyna was not boisterous or offensive and did not give any indication of intoxication, or evidence any intent to injure plaintiff or anyone else on the train.

12. While in the lounge car the plaintiff had indicated to one or more of the soldiers that she intended to stay up all night and see the sunrise. By 2:15 or 2:30 plaintiff was the only female left in the car with Reyna, Register, another soldier Wutkowski and an elderly black passenger, who was asleep in one of the chairs.

13. At this time Register and Wutkowski left the car. It was Register's intention to return after seeing Wutkowski to his sleeping quarters. The testimony does not reveal what happened to the elderly black passenger, but after Register and Wutkowski left the car, Reyna came over to the sofa where plaintiff was sitting and attempted to fondle her breasts and then to unbutton her halter. She left the sofa and ran to the ladies lounge, which was in the same car. This lounge or powder room contains an outer area which has mirrors, chairs and places for ladies to apply makeup, comb their hair, etc. The door from the main part of the car into this section of the powder room does not contain a lock. Inside of the powder room is another door leading into the toilet area which contains a commode, sink

and shower. The door to this area has a sliding bolt type lock.

14. Plaintiff screamed as she ran into the powder room and Reyna followed her. Since this room did not have a lock she retreated to the toilet area and locked the door. After Reyna had beat on the door for a while, plaintiff heard footsteps in the corridor. Thinking that Reyna had left, she opened the door slightly and found him still there. He forced his way into the toilet area, closed the door and the plaintiff was assaulted and raped. Photographs of both the plaintiff and Reyna show that each was scratched about the body, bitten and the plaintiff had a black eye. It is impossible to determine how long the assault and rape continued. Plaintiff testified that she was raped before the train got to Florence, South Carolina, again while the train was in the station at Florence (it stopped there for 15 to 20 minutes) and again shortly after leaving Florence, at which time she was rescued. The testimony of Reyna was so disoriented and incoherent as to be of no value. He is presently serving 10 years for assault and battery of a high and aggravated nature resulting from his encounter with the plaintiff. Although an assault and rape of plaintiff has been definitely proved, the Court has a serious question as to the number of rapes alleged and the total time elapsed. This doubt results from exaggerations and inconsistencies that appear in other parts of her testimony.

15. In addition to the assault and rape Reyna also forced plaintiff to perform fellatio upon him, during the course of which she bit him severely.

16. In the club car which contains the lounge area, the bar, the ladies powder room and toilet where plaintiff was assaulted, there is also a sleeping compartment which was occupied by Kathy Rowlette at the time of the assault. She had retired to her quarters at approximately 11:30 p. m. She testified that she heard four screams after she had been asleep for some time. She

took no action as a result of the screams, although she knew that the ladies lounge was next to her compartment and it was her duty as an employee of Amtrak to be concerned with the care and comfort of all passengers. She testified that she had been to a special school of one of the airline companies to train her for her duties with Amtrak, and there she was instructed in the care and treatment of passengers, even to the extent of delivering babies. However, she stated that she was not instructed in what to do about the rape of a passenger. Although the Court might understand the reluctance of a woman in this day and age to physically go to the assistance of another being attacked, or even to personally investigate the source of the screams, this rule does not apply to a person employed by Amtrak as a passenger service representative, whose duties include the care of passengers on the train. She certainly is charged with the duty of attempting to contact the conductor or other male train personnel and advising of the screams and assisting in rendering such assistance as may be possible to her. Not only did Rowlette not report this occurrence or attempt to assist or rescue the plaintiff, she refused to come out of her quarters after plaintiff had been rescued. The request of the conductor, who properly identified himself, went unanswered and she did not render any assistance to the plaintiff, and Rowlette stayed in her room until long after plaintiff had been removed from the train in Savannah. The Court was shocked by her failure and refusal to act in the assistance of a female passenger, but the Court was horrified to learn that she was subsequently promoted by Amtrak and now holds a more responsible and better paying position in the Penn Central Railroad Station in New York City.

17. Although the failure of Kathy Rowlette to aid or seek aid for plaintiff did not cause the attack or all of her subsequent physical and emotional injuries, such failure to act, after being put on notice by the screams, certainly aggravated and prolonged the attack causing additional injuries and damages to the plaintiff.

18. As the train left Florence, South Carolina a chair car attendant came into the club car and began to clean up the area. A few minutes after he arrived he heard a female scream and at first thought it was a passenger going between the club car and another car. He stated it was not unusual for ladies to scream or squeal when passing between cars. Almost immediately he heard another scream, realized that it came from the ladies powder room, and in haste left the car to find the conductor. He returned with the conductor, who rescued the plaintiff from Reyna and held Reyna until the officer in charge of the military detachment took him into custody.

19. At Savannah, Georgia plaintiff and Reyna were taken from the train and questioned and photographed by police and railroad agents. The plaintiff was also treated in the emergency room of a Savannah Hospital and later placed on another train to her destination in Fort Lauderdale, Florida.

20. Upon arrival in Fort Lauderdale, Florida, plaintiff did not wish to go to the home of her great aunt because of the black eye, scratches and other evidence of the physical attack she had sustained. She stayed in a boarding house and worked at the Hialeah Racetrack stable for approximately one month before going to the home of her great aunt on July 4, 1972. While in Savannah, she had a hospital bill charge of $9.50 and when in Miami she was examined by a gynecologist, an opthalmologist and examined and treated by a psychiatrist. The total medical expense for Florida was approximately $350.00.

21. The plaintiff stayed in Florida until approximately Thanksgiving 1972. After leaving Hialeah Racetrack she worked as a bookkeeper. Shortly after returning to her home in Virginia she moved back to Charlotte, North Carolina,

where she had attended college and worked as a waitress in a Holiday Inn and again as a bookkeeper. She has now returned to college and is making good grades (A's and B's) on her school work.

22. On March 15, 1975 she was referred by her attorneys to a psychiatrist in Florence for evaluation in preparation for the trial of a case. The psychiatrist testified at great length as to her present condition, but the Court finds his testimony incredible and his bill for services unconscionable. This psychiatrist states that he normally charges $35 for a 45 minute conference with a patient. However, if he is expected to testify in court, his charge is $100 for the 45 minutes. In addition to the psychiatric evaluation of March 15, 1975 for which he charged $100, he charged $100 each for 45 minute psycho-therapy sessions on March 29, April 5 and April 26, 1975. His bill then reflects $300 on May 12, 1975 for three hours of broken appointments. He stated that this was to cover the time he had set aside to testify in court and was then advised that the case would not be heard. This case was never set for trial by this court except for the day certain on which it was called. Even if the psychiatrist had been required to cancel certain appointments through error, the Court is puzzled as to why these were also charged at $100 per appointment rather than $35 per appointment. The bill also contains a charge of $100 for legal consultation on May 14, 1975, which was the second day of his trial, which charge could not be included in any damages against the defendants. The Court has outlined the method of this doctor's charges in order that it may become a part of the records of this court and may be used in the future by judges or attorneys in cases in which this person appears as a witness. The proper charge for a doctor in treating a patient should not be related to whether or not the patient has a case pending in court or whether the doctor may be called as a witness to testify.

Certainly for psycho-therapy a person with pending litigation should not be charged three times the rate of patients whose emotional problems are not related to tort actions. Medical charges must be reasonable in amount, and these are so unreasonable as to shock the conscience of the Court. These charges have not been taken into consideration in arriving at the verdict in this case, not only because such charges are unreasonable and improper, but because the Court has given little weight to the testimony given by this physician.

23. The psychiatrist, who did not see the plaintiff for almost three years after the occurrence of June 3, 1972 gave the opinion that she was permanently psychotic as a result of the assault and rape, that she would need psychiatric treatment for the remainder of her life, but for the next two years she would require one hour per week with the psychiatrist and two hours per week in group therapy, at a charge of $55 per week, drugs amounting to $40 per month, and at the conclusion of this time there was a 90% chance that she would make a "social recovery". The doctor testified that a "social recovery" would be such as would allow the plaintiff to keep house, do the grocery shopping, attend school and handle the normal affairs that routinely arise, but that she would still need psychiatric treatment from time to time. The problem with this testimony is that it is unbelievable. The doctor stated that she could not hold a job and was failing in her school work, when the testimony of the plaintiff showed that she was making good grades and had held a number of jobs. A job of bookeeper requires a person to be well organized mentally and emotionally. A waitress must be able to meet the public and be at ease around people. She has worked constantly since June 1972, her present grades are at the 3.6 level, she is presently handling her grocery shopping, running her home and apparently happily married. The Court observed the plaintiff very closely

throughout the trial and found, except for the time that she was actually on the witness stand, she appeared to be alert, well composed and smiling, particularly when her husband was on the stand. The psychiatrist also put great emphasis on a two month period of amnesia he thought plaintiff had sustained after arriving in Florida. From the plaintiff's answers to interrogatories it appears to have been two or three days when she was confused immediately after getting to Florida but no lengthy period of amnesia.

24. In addition to the physical injuries and damages inflicted upon the plaintiff in the attack, she sustained emotional trauma and great mental anguish.

## CONCLUSIONS OF LAW

The Court has jurisdiction under 28 U.S.C. § 1332 because of diversity of citizenship and the amount in controversy.

The law applicable to this action is that of South Carolina which is stated in *Spires v. Atlantic Coast Line Railroad Co.*, 92 S.C. 564, 75 S.E. 950, 952 (1912).

"The law on the subject is too well established to require discussion. It is the duty of a carrier to use the highest degree of care to protect a passenger from the attacks of a fellow passenger, when the carrier has knowledge of the existence of danger from this cause, or of facts from which the danger may be reasonably anticipated. *Franklin v. Atlanta [and C.A.L.] Ry.*, 74 S.C. [332] 340, 54 S.E. 578; *Anderson v. S. C. & G. R. R. Co.*, 77 S.C. 434, 58 S.E. 149, 122 Am.St.Rep. 591; *Norris v. Southern Ry.*, 84 S.C. 15, 65 S.E. 956."

The *Spires* case involved a disturbance on an excursion train running from Augusta, Georgia to Sumter, South Carolina upon which the plaintiff was shot and injured by another passenger. The facts show that there was an actual riot upon the train and no action was taken to quell the riot by railroad employees and that railroad had notice that such disturbances were frequent on excursion trains and should have provided a police force adequate to protect the passengers. The record also showed that the train could have returned to Augusta after the rioting began or could have stopped in some of the small towns along the way to seek police assistance. The important thing about *Spires* is the requirement of knowledge or reasonable anticipation.

Many of the South Carolina cases regarding protection of passengers from attack of other passengers are discussed in *Lentz v. Carolina Scenic Coach Lines*, 208 S.C. 278, 38 S.E.2d 11 (1946). After reviewing the various decisions the Court states at page 16:

"It should be apparent from the foregoing that the principle under discussion does not make a carrier an insurer of the safety of its passengers. On the contrary, a study of the cases reviewed, and the decisions herein discussed, make it plain that the carrier is not liable for a sudden and unexpected attack by a passenger. The negligence for which the carrier is held liable in such cases is not negligence of the passenger in committing the wrongful act, but negligence by the carrier exists, if at all, from its failure to avert the wrongful act. Under ordinary circumstances, a carrier is not required to expect violent misconduct from its passengers. As was stated in *Franklin v. Atlanta & C. A. L. Ry.*, supra, good conduct and respect among passengers toward each other is the rule rather than the exception. So to fix liability in such a case it is essential that proof be offered from which a jury would be justified in finding that the carrier had knowledge of the danger, or of facts from which danger could have been reasonably anticipated, and that such knowledge was acquired in time to take steps to avert the wrongful act.

But if such evidence is offered, defendants cannot escape liability by saying that the particular act and par-

ticular injury was not foreseeable. All that our law requires is that one foresee that his negligence would probably result in injury of some kind to some one. *Tobias v. Carolina Power and Light Co.*, 190 S.C. 181, 2 S.E. 2d 686, 688."

The *Franklin* case cited above was decided in 1906 by the South Carolina Supreme Court and in discussing the highest degree of care owed to passengers it states:

"But there are factors which enter into the practical application of the rule of the highest degree of care to the protection of passengers from improper conduct of fellow passengers which are not present in its application to the carrier's mechanical agencies and its servants. Due regard to the known mechanical laws, and the selection of employeés, are matters within the control of the carrier; but a carrier has only a limited control over passengers on its trains. It has no right to direct their actions, so long as they do not conflict with its rules reasonably necessary for the conduct of its business, or with the correlative rights of other passengers. Indeed, interference on the part of a conductor with free communication between passengers will be generally regarded as impertinent by those concerned, except when there is a clear violation of the rules of good behavior by one passenger to the annoyance of others. When that moment comes, it is obviously the duty of the conductor to act, but to know the moment, until complaint is made by the passenger of annoyance, is often extremely difficult. Ordinarily, any unwelcome advances by one passenger to another may be effectively rebuffed by the passenger himself. In applying the highest degree of care to its duty of protection by the conductor, it is further to be borne in mind that good conduct and respect among passengers is the rule, and insult and wrong extremely rare, and that experience has shown that other duties of a conductor requiring his absence from the car from time to time may ordinarily be performed without risk of injury of one passenger to another in his absence. Hence it cannot be laid down as a general proposition that the exercise of the highest degree of care for the protection of passengers from each other requires that the carrier should keep a watch over the passengers on his train, except over those from whom it has reason to anticipate improper behavior. . . . While not required to furnish a police force sufficient to overcome all force when expectedly and suddenly offered, it is the carrier's duty to provide help sufficient to protect the passenger against assaults from every quarter which might reasonably be expected to occur, under the circumstances of the case and the condition of the parties, and, having furnished such force, the carrier is chargeable with their neglect in failing to protect a passenger from assaults by strangers. This strict rule of duty must, however, be applied in view of the relation which the carrier sustains to all the passengers, and the circumstances of each particular case calling for its exercise. Knowledge of the existence of the danger, or the facts and circumstances from which the danger may be reasonably anticipated, is necessary to fix liability upon the carrier for damages sustained in consequence of failure to guard against it."

In *Dennis v. Columbia Electric St. Ry. L. & P. Co.*, 93 S.C. 295, 76 S.E. 711 (1912) the plaintiff was a passenger who was forcibly removed from the streetcar by other passengers in the presence of the conductor. After a verdict for the plaintiff the defendant appealed on the ground that the Judge's charge was incorrect in stating the common carrier's duty to provide the highest degree of care to protect its passengers from the violence of other passengers, since such rule applied only when

the carrier has knowledge of the existence of the danger or of facts and circumstances from which the danger may be reasonably anticipated. The Court found that the charge given at trial was proper stating:

"The undisputed evidence in this case, stated most strongly for the defendant, shows that plaintiff was thrown from the car while it was in motion, in the presence of the conductor, who saw what was being done, if he did not assent to it or assist in doing it, and that he made no effort whatever to stop the car, or to prevent plaintiff from being thrown out—not even by commanding the person who was most active in doing it to desist. We do not think that there is any evidence in the case which could not induce in the mind of a reasonably intelligent juror that the conductor did not know of the danger to plaintiff, and that he made no effort to protect him."

 In the present case the evidence does not support a finding that Seaboard Coastline Railroad or its employees had knowledge of the existence of any danger to plaintiff or of any facts and circumstances from which the danger might reasonably have been anticipated. The attack by Reyna upon the plaintiff was sudden and unexpected. The railroad employees did not have notice that the attack had taken place or was in progress in sufficient time to stop it, until screams were heard after the train left Florence, South Carolina, at which time the employee cleaning the club car immediately went for the conductor. Plaintiff asserts that the railroad should be held liable for certain of plaintiff's injuries and damages because this employee did not immediately go to the rescue of the plaintiff when he first heard her scream. However, after hearing the testimony of chair car attendant Stafford, who was cleaning the club car when he first heard the screams, the Court finds that he acted reasonably. Due to the hour, 3:00 a. m., the fact that the screams were coming from the ladies lounge, that the car attendant being a black male, he did not feel that he should interject himself into a situation behind a closed door to a ladies restroom without first checking with his conductor. He found the conductor almost immediately and very little delay was caused by his action, which the Court finds to be reasonable and understandable under the circumstances.

The plaintiff contends that the bartender in the club car was negligent in selling to or allowing Reyna to have seven drinks from the bar during the hours that the bartender was working. From the testimony in the case relating to the manner in which drinks were bought, often singly or individually, but also one person ordering for a large group at the bar and then taking the drinks back to the group, it would be impossible for the bartender to know who was drinking or how much a person was drinking. There was no evidence that Reyna gave any indication of being intoxicated, offensive or otherwise called attention to himself so as to put the bartender on notice. There is also insufficient proof to show that the rape resulted from the alleged intoxication or that intoxication was a proximate cause thereof.

The plaintiff cites *Samson v. Saginaw Professional Business, Inc.,* 393 Mich. 393, 224 N.W.2d 843 (1975), as authority to support its position that the railroad should have reasonably foreseen the risk of harm to the plaintiff. *Samson* involved an attack in an office elevator by a mental patient upon a secretary. The State Mental Clinic was in the same office building with the employer of the secretary and the Court held the landlord responsible on the grounds that it had taken no security measures and it knew there was concern of other tenants about the presence of mental patients in and about the building. *Samson* is not analogous to the present situation since the railroad had no notice that Reyna was dangerous, or had a mental problem, the existence of which has not been established. Reyna obviously has prob-

lems in expressing himself, since his testimony was difficult to follow, but as a member of the Army Reserve, traveling with his unit, the railroad is certainly not on notice that he might be a mental case.

■ The plaintiff also takes the position that the railroad knew or should have known that the introduction of large numbers of soldiers into a passenger train "especially where the soldiers were returning home after duty training, could have reasonably been expected to cause danger to passengers." The plaintiff asserts that additional railroad employees should have been placed on the train for the protection of the passengers, citing *Spires v. Atlantic Coast Line Railroad, supra,* in which the plaintiff was shot and injured by another passenger during a riot on an excursion train. In that case the Court stated:

". . . It is a matter of common knowledge that disorder is to be anticipated on excursion trains such as this was; and when a railroad company chooses to run such a train for its own profit it is its duty to provide a police force adequate to protect the passengers from any disturbance which due precaution requires that it should anticipate."

Obviously, in 1912 a ride on an excursion train must have been quite an experience, if the Court would take judicial knowledge of the disorders that occurred thereon. This is not the situation in 1972 involving military personnel on civilian trains. The soldiers in question were citizen-soldiers, serving in the Reserve or the National Guard from the State of Florida. They were housed in four cars attached to the back of the regular passenger train and were under the command and control of their commissioned and non-commissioned officers. The fact that they were returning from training duty would not put the railroad on notice that they might be dangerous or that one of them might rape a female passenger. Certainly there has been no proof of sufficient prior problems with military personnel to have put the railroad on notice that trouble could be expected or that additional guards were necessary, or that the soldiers would injure civilian passengers.

■ The plaintiff introduced Seaboard Coast Line Railroad Company Operating Rules book containing 182 pages, but with particular reference to Rules 857 and 862 which provide:

"857. Toilet compartments in cars must be kept locked while trains are standing at terminals and other designated points, and must be unlocked promptly after leaving such stations. Before locking toilets, it must be ascertained that they are not occupied.

862. Announcements must be made in cars approaching stations at which stops are to be made. Such announcement must be made in a clear and distinct voice. If train stops after announcement has been made, but before reaching the station, passengers must be warned that such stop is not the station stop.

Conductors must know that pullman employees have an understanding as to the stations at which passengers are to detrain."

The testimony showed that these rules were not complied with by Seaboard Coast Line, but the Court finds that such violation did not operate as a proximate cause of the attack upon the plaintiff. It is possible that if these rules had been complied with the attack might have been discovered sooner, but a reasonable explanation for non-compliance was made by the railroad.

■ The financial plight of the majority of the railroad companies in America is a matter of which this Court can take judicial notice. Otherwise, Amtrak would never have been created. The testimony shows that it would require a great number of additional railroad employees to comply with the locking and unlocking provisions of 857, that there is no need to lock or unlock compartments or ascertain if they are

occupied, at 3:00 a. m. in the morning since they are not usually then in use, and that the real purpose of the rule is to prevent waste materials from being discharged on railroad employees who might be checking equipment near the toilet outlet while the train is stopped in the station and also to prevent discharge of such waste materials on the tracks in the station, which would necessitate cleaning the tracks after the train departed.

The announcements provided in 862 are not made on reserve seat coaches, since the chair car attendants keep a diagram showing the destination of passengers according to the number of the seat in which they are located. This prevents all the passengers on the car from being disturbed by cutting on the lights and calling out the stations during sleeping hours. This type of action is also indicated by the last sentence of the rule requiring pullman employees to understand the stations at which passengers are to detrain. Obviously the purpose is to prevent waking every sleeping pullman passenger at every stop, but to have the porter know the berth and destination of each pullman passenger so as to awaken them and have them ready to disembark at the proper time.

Failure to announce the arrival of train 83 to an obviously empty club car at three o'clock in the morning could not be considered as a proximate cause of the plaintiff's injuries and damages.

■ The Court finds that there was no breach of duty by or negligence of Seaboard Coast Line Railroad or its employees which either produced, contributed to or prolonged the rape of the plaintiff. The same cannot be said of Amtrak and its employee Kathy Rowlette. She was an employee especially trained to care for passengers and was put on notice by the screams that someone in the ladies lounge was in acute distress and in need of assistance. Although the law might not require her to risk her life by confronting the rapist and attempting to rescue a female passenger from his clutches, the law certainly requires that she take some action and seek male assistance from other train personnel in investigating the cause of the screams. The *Dennis* case establishes that an employee of a common carrier may not stand by with knowledge that a passenger is in danger and do nothing to assist such passenger. Rowlette's refusal to even come out and minister to the plaintiff after the conductor and others rescued her, is further evidence of her indifference, and disregard of her duties. As a result of her failure to act the plaintiff's ordeal was prolonged and her injuries and damages increased and National Railroad Passenger Corporation must respond therefor.

■ The Court finds that the actions of Amtrak's (National Railroad Passenger Corporation) employee amounted to gross negligence entitling the plaintiff to punitive as well as actual damages. The amount of Ten Thousand and No/100 ($10,000.00) Dollars punitive damages is awarded to the plaintiff together with Twenty Thousand and No/100 ($20,000.00) Dollars in actual damages to cover all of her claims for personal injuries, medical expenses, lost time from work, mental anguish and emotional distress, pain and suffering, any permanent emotional condition resulting therefrom and any future claims for any of these items. These are the injuries and damages which resulted after Amtrak's employee heard her screams and failed to take any action to assist her.

It is, therefore, found that the plaintiff Debora Hanback shall have judgment against National Railroad Passenger Corporation in the amount of Twenty Thousand and No/100 ($20,000.00) Dollars actual damages and Ten Thousand and No/100 ($10,000.00) Dollars punitive damages. The Clerk shall enter judgment for plaintiff therefor.

The Clerk shall enter judgment in favor of the defendant Seaboard Coast Line Railroad.

And it is so ordered.