# MARGARET LEONA PUGH

*vs.*

# THE WASHINGTON RAILWAY AND ELECTRIC COMPANY.

*Carriers—Liability to Passenger—Assault by Fellow Passenger—Negligence of Conductor.*

For an injury to a passenger, arising wholly from the independent misconduct of a third person, whether a fellow passenger or a stranger, the carrier is liable only if the carrier, or his servants, could have prevented the injury, but failed to interfere to avert it. p. 233

The failure or omission of a carrier's servant to prevent the commission by a third person of a tort upon a passenger must, to be a negligent failure or omission, be a failure or omission to do something which could have been done by the servant, and consequently it is necessary that the servant had knowledge, or with proper care could have had knowledge, that the tort was imminent, and that he had that knowledge, or the opportunity to acquire it, sufficiently long in advance of its commission to have prevented it with the force at his command. pp. 233-236

*Decided April 5th, 1921.*

Appeal from the Circuit Court for Montgomery County (PETER and WORTHINGTON, JJ.).

The cause was argued before BRISCOE, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*John A. Garrett* and *H. Maurice Talbott,* with whom were *Talbott & Prettyman* on the brief, for the appellant.

*Wm. H. Talbott* and *S. R. Bowen,* for the appellee.

Pattison, J., delivered the opinion of the court.

The appeal in this case is from a judgment for the defendant in an action brought by Margaret Leona Pugh, the appellant, against The Washington Railway and Electric Company, which operates an electrically equipped railroad from the City of Washington to the town of Rockville, in Montgomery County, Maryland.

As disclosed by the declaration, the ground upon which recovery was sought was the negligence of the conductor, a servant of the defendant company in charge of its car, in failing to protect the plaintiff from insult and injury caused by others, while the plaintiff was a passenger upon said car.

The undisputed facts of the case are these: The plaintiff, seventeen years of age and unmarried, and her sister Maude Bettiker, twenty years of age, were employed in the City of Washington. On the 14th day of March, 1917, they visited their father, who lived in Potomac, Montgomery County, Maryland. After spending the day at their father's home, they, accompanied by their uncle, went to Rockville to take the 9.30 car of the defendant company for Washington. At this time there was a strike on the part of the conductors and motormen of said company, and the cars were running very irregularly. The plaintiff and her sister reached the station at Rockville about nine o'clock, but the first car thereafter going to Washington did not leave Rockville until about 12 o'clock. When the plaintiff and her sister boarded this car, they found on it only the motorman, conductor, and one Stanley Gingell, a deputy sheriff of Montgomery County, who at the time was also in the service and employment of the railroad company, having been employed by it because of said strike, to look after and protect its property from violence and prevent disorders. The sisters took seats about midway of the car on the right side of the aisle. At this time Gingell, whom they had "known all their lives," was seated in the upper end of the car, but after the car had gone a short distance—to the limits of Rockville—Gingell went back to where the sisters were seated, and turning the seat of the car

immediately in front of them, he sat upon it, next to the window, facing the sister of the plaintiff, who was seated next to the window on the seat occupied by her and the plaintiff, leaving the vacant seat beside Gingell directly in front of the plaintiff. No other persons boarded the car until it reached the car barns at or near the District line, where ten or fifteen men entered in a boisterous and loud manner, curs· ing, laughing and talking loudly. After entering the car they were seen to have whiskey, and this some of them drank while in the car. Two of these men took seats directly across the aisle from where the plaintiff was seated. The name of one of them, as it was afterwards learned, was Padelli. He, after sitting there a short while, got up and took the vacant seat next to Gingell, immediately facing the plaintiff, and he for sometime sat there without engaging in conversation with Gingell, the plaintiff or her sister, although Miss Bettiker testified that at the time he took the seat he spoke to Gingell and Gingell spoke to him, but this is at variance with Gingell's testimony. It was while seated in this position that the offense complained of was committed by Padelli.

The sister of the plaintiff, in relating the facts in connection with the acts and conduct of Padelli at such time, testified that, shortly after the men boarded the car, the conductor walked down to the back end of the car and then back to the front end and there stood. The car had on each side of the end a seat running parallel with the car, capable of holding four or five passengers, and in the central part short traverse seats on each side of the centre aisle, each seat being designed for the occupancy of two persons. Padelli, who was across the aisle from them and next to it, got up and came over and took the vacant seat by Mr. Gingell, who was talking to witness, and when so seated Padelli was directly in front of the plaintiff.

When the car reached a place called McLean's Clock, about ten or fifteen minutes after Padelli had taken the seat by Gingell, she heard her sister cry "stop," to which Padelli replied "that he was just getting his hands warm" and when

he did it again, she again told him to "stop" but he would
not do it.   The conductor was at the time standing there,
laughing at her, and made no effort to stop him.   Mr. Gin-
gell made him stop and he got up and went into another seat.
Gingell, when his attention was called by the "outcry" made
upon the second occasion, reached over, grabbed Padelli's
hand, and after a struggle succeeded in breaking his hand
away, and pushed him into the aisle.   Padelli, she said, had
his hand under her sister's clothes for about two minutes and
at such time the conductor was two or three feet away laugh-
ing at him.   Later in her testimony she stated that at such
time the conductor was standing "in front of us, about two
or three seats up."   She further testified that the conductor
at times was in the rear and at other times in the front of the
car, and at the time of the occurrence mentioned the con-
ductor was walking backwards and forwards and was a con-
siderable distance from them at various times and talking at
times with other people in the car, and may have been look-
ing at other people in the car.   She did not know he was
laughing at them, though he was looking at them.

The plaintiff testified that when she "first felt the man's
hand upon her 'limb' she 'cried out,' and he replied that he
was simply trying to warm his hands, and she supposed that
was true; she then did not doubt his word as there was a
radiator under the seat on which she was sitting.   She said
at that time Gingell "did not notice the action and there was
nothing unusual to attract his attention; about two minutes
later he put his hand under my dress and caught hold of my
leg above the knee; I called the conductor, who was standing
at the end of the seats, I don't know how many seats away,
* * * he was at the end of the car"; and at that moment, when
Padelli had hold of her leg, she called Mr. Gingell, who was
talking with her sister, and sitting alongside of Padelli; she
called to Gingell because she supposed he was not paying any
attention to Padelli; if he had been he would have done some-
thing, as he was not more than two or three feet away and
was a deputy sheriff.   She testified that Padelli was seated

immediately in front of and facing her for ten or fifteen minutes before the act mentioned, and during that time sat there quietly while she talked to Gingell and her sister. She further testified that Padelli was a perfect stranger to her and her sister, and neither had spoken to or looked at him on the car, and did nothing to invite his attention. That at the time Gingell was "tusseling" with Padelli, the conductor who "was standing at the end of the seats in the end of the car up towards the front," did nothing, just stood and laughed; she could not tell that his vision was directed directly at the seat and what this man was doing, but he was standing there looking on and was in a position where he might have seen if he had looked in her direction. She could not say the conductor was laughing at what she had said or something else. She also testified that Padelli put his left hand on her right leg, that it was possible that the conductor did not see what this man was doing at the moment; that she was sitting with her legs crossed.

Gingell, when called by the plaintiff, testified that he at the time was deputy sheriff of Montgomery County and was employed by the defendant company for the protection of its property from violence and to prevent disorders; and that on the occasion mentioned he "was riding on that car to prevent or detect trouble or disorders that were occurring"; and that the same was known to the conductor; and that he "was employed and paid by the railroad company" for such services.

He further testified that the cars were being operated by a crowd of men known as "strike breakers" and that the men who boarded the car at the barns were men whose faces he knew as members of the strike breaking crowd, but did not know their names. He then spoke of the act of Padelli, saying that while he was talking to Miss Bettiker, plaintiff's sister, his attention was directed to the plaintiff, when she first called or cried out to the man seated beside him to "stop," that a few minutes thereafter she again called out in a loud voice "stop," and appealed to the conductor to "make this

man stop." He looked and saw this man's hand about the knee and she was fighting him trying to get his hand away "and finally I hollered to the conductor and by that time he had his hand upon her knee, at that time the conductor was standing just over Padelli, having his hand upon the back of that seat and the other hand upon the back of the seat across the aisle, and he just stood there and laughed." The witness grabbed Padelli's hand with one of his, looked up at the conductor and said to him "take this damn fool away from here," whereupon he grabbed the assailant with both of his hands and tried to break his hold upon the young girl, and "I got it off but he kept pushing as I took it off, and insisted on going as far as he could"; and after a struggle lasting two or three minutes he finally succeeded by striking him with his fist on the side of the head and knocked him down in the aisle," after which there was no further trouble. The witness subsequently stated, however, that he "did everything he could do to prevent Padelli's action, but did nothing on the first occasion, as he did not know what had happened; that the next time she hollered he looked at the conductor and at Padelli and saw where his hands were, and acted at once, did not fool away any time; "I grabbed him and hollered to the conductor"; that soon after the men got on the car, and were drinking, both girls were looking around at the men as they drank; the girls called witness' attention to the fact that the man who was sitting next to Padelli was drinking, and a few minutes after that Padelli came over and sat down by the witness, but neither spoke to the other; this was probably two squares from the car barn; the first time witness heard Mrs. Pugh say "stop," and Padelli said he was warming his hands, Padelli was sitting halfway turned, with his hands down on a slant and off of his lap, and between the two girls: "I think Mrs. Pugh's leg was crossed; it was his left hand that he put on her leg; but it was not touching me; that when Mrs. Pugh first said "stop" I did not look, and did not see his hand, and at the second time she hollered I did not look"; and when Padelli said he was warming his

hands, his hands were kind of sticking over the edge of the seat; Mrs. Pugh had her legs crossed and that would give a better view of his hands if you looked down; witness saw Padelli's hand over near Mrs. Pugh's skirt; at the time she hollered to the conductor, witness grabbed him at once with his right hand; Padelli kept pushing and insisted on catching hold again and witness hit him and knocked him down into the aisle; "witness done this as quickly as it could be done under the circumstances."

At the conclusion of the evidence the court, at the instance of the defendant company, granted a prayer directing a verdict for the defendant, because of a want of evidence legally sufficient to entitle the plaintiff to recover.

The law applicable to this case is, we think, very clearly enunciated in an opinion of this Court by CHIEF JUDGE MC-SHERRY, in *Tall* v. *Baltimore Steam Packet Company,* 90 Md. 253. In that case the court said: "A carrier is not an insurer of the absolute safety of his passengers; yet he is bound to use reasonable care according to the nature of his contract; and as his employment involves the safety of the lives and limbs of his passengers, the law requires the highest degree of care which is consistent with the nature of his understanding. *B. & O. R. R. Co.* v. *State, use of Hauer,* 60 Md. 449. This, though the measure of the carrier's duty as between him and his passenger in respect to the acts or omissions of the carrier and his servants towards the passenger, is not the standard by which his liability to the passenger is to be gauged or determined when intervening acts of fellow passengers or strangers directly cause the injury sustained whilst the relation of passenger and carrier is subsisting. Such an injury, due in no way to defects in the means of transportation or to the method of transporting, or to an actual trespass by an employee whilst the relation of passenger continues, and involving, therefore, no issues of negligence concerning the duty to provide safe appliances and competent and careful servants to operate them, but aris-

ising wholly from the independent misconduct of a third party, furnishes a ground of action against the carrier only when the carrier, or his servants, could have prevented the injury but failed to interfere to avert it. The duty of the carrier in such instance is, consequently, relative and contingent, not absolute and unconditional. It springs from a condition, not of the carrier's but of a third party's creation, coupled with a knowledge by the carrier's servants that the condition exists, and with time enough intervening between the acquisition of the knowledge and the infliction of the injury to enable the servants of the carrier to protect the passenger from the third party's misconduct. The negligence for which, in such cases, the carrier is responsible is not the tort of the fellow passenger or the stranger, but it is the negligent omission of the carrier's servants to prevent that tort from being committed. The failure or omission to prevent the commission of the tort, to be a negligent failure or omission, must be a failure or an omission to do something which could have been done by the servant; and, therefore, there is involved the essential ingredient that the servant had knowledge, or with proper care could have had knowledge, that the tort was imminent, and that he had that knowledge, or had the opportunity to acquire it, sufficiently long in advance of its infliction to have prevented it with the force at his command. If this were not so, the mere tort of a fellow-passenger or a stranger would constitute, of itself, the negligence of the carrier, and the carrier would be held answerable for wrongful acts of a third party, though the carrier's servants were without fault, ignorant of the third party's purpose to make an assault and were, consequently, unprepared to avert it. Such a rule would make the carrier an absolute insurer of the safety of the passenger against the wrongful conduct of third persons, though, as between the carrier and the passenger, in ordinary cases, the carrier's liability is made to depend on his or his servant's negligence. In *B. & O. R. R. Co. v. Barger,* 80 Md. 30, we said: "If a

conductor 'has the opportunity to prevent an assault on a passenger in his charge, it is his duty to do so, and his failure to make a reasonable effort to protect the passenger from such assault, would make the company responsible.' Or, as differently expressed in *Ill. Cent. R. R. Co.* v. *Minor,* 69 Miss. 710, 'a common carrier is required to protect a passenger from an unprovoked assault of a fellow-passenger, if the conductor knew that it was threatened and could have prevented it with the assistance of employees and willing passengers.' *s. c.,* 16 *L. R. A.* 627, and copious notes. The overwhelming weight of judicial precedent sustains this view of the carrier's liability in such instances as are presented by the record before us. *N. J. Steamboat Co.* v. *Brackett,* 121 *U. S.* 645; *Lucy* v. *Ch. Great West. Ry. Co.,* 64 Minn. 7; *s. c.* 31 *L. R. A.* 551; *Ball.* v. *C. & O. Ry. Co.,* 93 Va. 44; *s. c.* 32 *L. R. A.* 792; *Britton* v. *A. & C. A. L. R. Co.,* 88 *N. C.* 536; 5 *Am. & Eng. Ency. Law* (2nd ed.), 553."

In deciding whether the Court below properly ruled in directing a verdict for the defendant because of the fact that the evidence offered was legally insufficient to entitle the plaintiff to recover, we will apply the law as above laid down to the facts of this case.

There is certainly no evidence that the conductor had any knowledge, or with proper care could have had knowledge, that the assault upon the plaintiff was imminent, for there was nothing in the conduct of Padelli to excite the apprehension of even those sitting beside him that he contemplated such an assault. The plaintiff herself says, after moving to the seat immediately in front of and facing her, and in close proximity to her, he sat there quietly for ten or fifteen minutes, while she, her sister, and Gingell were engaged in conversation; and not until she felt his hand on her leg did his presence so near to her give her any fear or anxiety as to his contemplated movements in relation to her, and whatever apprehension or alarm this act of his caused her, it was soon allayed by his reply, which she said she believed to be true;

and her request to him to "stop" could not have been expressive of much alarm, for it did not arouse the apprehension of either her sister or Gingel, who were sitting so close to them. In fact, the plaintiff, in explaining why Gingell's attention was not attracted to her when she first told Padelli to stop, said that "there was nothing unusual to attract his attention."

Now, if the attention of Gingell and her sister, who at the time were seated so near her, was not attracted by what was being done by Padelli, or by what has been termed by some of the witnesses as the "outcry" of the plaintiff, why should the attention of the conductor have been attracted to the conduct of Padelli, when by the testimony of all those who testified as to his position at such time, he was much further removed from the scene of the trouble.

Gingell, whose duty it was, as much so as that of the conductor, to protect the plaintiff while a passenger upon the car, though seated near both Padelli and the plaintiff, and only a few minutes before had heard the plaintiff tell Padelli to stop what he was doing, never, it seems, suspected a renewal of the assault, and it was not until his attention was called to it the second time that he became aroused to the necessity of doing something to relieve the situation, and then for the first time the conductor was called upon to protect the plaintiff. At such time, it will be remembered, Gingell and Padelli were occupying one of the seats of the car. Gingell seated to the right of Padelli, with his right hand next to the left hand of Padelli, which the latter used in the assault upon the plaintiff; and Gingell says that, upon her call to him at such time, he called the conductor, but did not wait, but grabbed Padelli's hand at once with ths right hand, and while Padelli "kept pushing and insisting on catching hold again," he hit him and knocked him down in the aisle. Gingell was in a much better position to extricate the hand of Padelli from the position it was in than the conductor, who was at the time several seats away, as stated by the plaintiff,

and no doubt Gingell succeeded in removing the hand of Padelli much more speedily than the conductor could have done.

There is certainly no evidence that the conductor had knowledge, or with proper care could have had knowledge, that the assault was imminent, or if so, that he had such knowledge sufficiently long in advance of the infliction of the assault to have prevented it. Nor is there any evidence that, had the conductor interfered, he could have ended the assault more speedily.

As stated in *Tall* v. *Steam Packet Company, supra,* "The carrier's liability does not in such cases depend upon the naked fact that an injury happened—if it did, as already remarked, the measure of his duty would be that of an absolute insurer. But it depend on the fact of an injury and the concomitant fact that the negligence of the carrier's servant in omitting to prevent the doing of the act which produced the injury, actually caused the injury. Proof then must be of both of these constituent elements, of the plaintiff's cause of action."

While the conduct of the conductor was most reprehensible, if the evidence of some of the witnesses be true, nevertheless the defendant should not be held liable therefor, unless the conductor knew or with proper care could have known of the imminence of the assault in time to have prevented it and did not do it. As there is no evidence, in our opinion, showing such facts, the court below acted properly in directing a verdict for the defendant. The judgment will therefore be affirmed.

*Judgment affirmed, with costs.*