816 A.2d 930

**Kenneth TODD**

v.

**MASS TRANSIT ADMINISTRATION.**

No. 61, Sept. Term, 2002.

Court of Appeals of Maryland.

Feb. 14, 2003.

150

**152**

Damon A. Trazzi (Trazzi & Grasso on brief), Timonium, for appellant.

Laura C. Walters (Drechsler, Larkin & Walters, P.C., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

Kenneth Todd (hereinafter "Mr. Todd") sued the Mass Transit Administration (hereinafter "MTA") for personal injuries that he sustained when he was attacked by other passengers on an MTA bus. The novel issue presented in this case is whether MTA had a duty to take affirmative action to protect Mr. Todd from the attack. MTA prevailed on its motion for summary judgment before the Circuit Court for Baltimore City. For the reasons set forth below, we reverse.

## I. Background

On the holiday evening of July 4, 2000, at about 10 o'clock, Mr. Todd was a passenger on a bus operated by the MTA in Baltimore City. He had chosen to sit just behind the rear exit doors in an aisle seat that faced the front of the bus. At one of the bus's stops during Mr. Todd's ride, a group of approximately fifteen to twenty "young kids" boarded the bus, filling the bus to its capacity. The juveniles immediately began "irritating" and "cursing" other passengers near the front of the bus. Although other passengers complained to the bus driver about the kids' behavior, the bus driver took no action to quiet the youths. The group of kids continued to harass passengers as they "worked their way" to the back of the bus toward Mr. Todd. About five minutes after the juveniles

boarded the bus and while Mr. Todd was "minding [his] business," one of the kids "struck him in the back of [his] head." Mr. Todd reacted by asking the group of kids, "[W]hat['s] the problem?" The entire group then immediately "jumped on" Mr. Todd, punching, "stomping," and "kicking" him. Although Mr. Todd attempted to shield himself, the attackers struck his face, shoulder, and lower back. The attack lasted four to five minutes until the bus driver, Cedric Rolle (hereinafter "Mr. Rolle"), stopped the bus, allowing the attackers to flee.

While Mr. Todd's attack was underway, another passenger yelled, "Bus driver, stop the bus. They are beating up this man back here. Stop the bus." At the time when Mr. Rolle heard this exclamation, he was attempting to cross the Orleans Street Bridge in a westbound direction. The travel lanes on the bridge, however, were congested with illegally parked cars from people who were watching an ongoing July 4th fireworks presentation. Although no other vehicles on the bridge were moving, Mr. Rolle continued his course, focused on maneuvering the "creeping" bus through the maze of illegally parked cars. Once the bus finally made it across the bridge, Mr. Rolle took the first available left turn and brought the bus to a halt by the street curb on Saint Paul Street. He then opened the bus doors and pressed the "panic button" to alert the police of the attack. With the bus stopped, the attackers were able to flee by running out of the doors and jumping out of the windows.[1] Mr. Todd sustained bruises to his back and various cuts and abrasions.

Mr. Todd subsequently brought a negligence claim against MTA in the Circuit Court for Baltimore City. He alleged that

---

1. Mr. Rolle's response to the attack on Mr. Todd apparently comported with MTA procedures. According to the testimony of Phyllis Love, MTA's corporate designee, bus drivers learn in their MTA training that they "absolutely" should not intervene physically in an attack upon a passenger. Ms. Love also indicated in her testimony that a driver who intervened physically in an attack upon a passenger would be disciplined for violating the bus operator's rule book. MTA instructs its drivers in such an event to do nothing more than summon the police by pressing the "panic button."

MTA breached its duty of care to him by failing to "take[ ] steps to prevent the attack" when it "knew or should have known" of the impending assault and by "fail[ing] to come to [his] assistance or [to] take[ ] steps to assure his safety" after it had learned that an "altercation" had begun. After a period of discovery, MTA filed a motion for summary judgment, in which it argued that Mr. Todd presented "no evidence that [its] bus driver knew that [Mr. Todd] would be attacked or was in danger of being attacked," and, therefore, the driver could not have prevented Mr. Todd's injuries. Without stating its reasons, the Circuit Court granted MTA summary judgment in an order dated March 8, 2002. On April 1, 2002, Mr. Todd noted a timely appeal to the Court of Special Appeals. This Court, on its own initiative and prior to any proceedings in the Court of Special Appeals, issued a writ of certiorari, *Todd v. MTA*, 370 Md. 268, 805 A.2d 265 (2002).

Before this Court, Mr. Todd presented the two following questions:

I.  Once a common carrier becomes aware that a passenger is being assaulted by a third party, does the carrier have a duty to take steps to protect the passenger from further attack?

II. Viewing the facts and the permissible inferences to be drawn from them in the light most favorable to Mr. Todd, did the court err in granting the Mass Transit Administration's motion for summary judgment?

We hold that both of Mr. Todd's questions should be answered affirmatively and, consequently, reverse the decision of the Circuit Court.

## II. Standard of Review

This Court reviews an order granting summary judgment *de novo. Beyer v. Morgan State Univ.*, 369 Md. 335, 359, 800 A.2d 707, 721 (2002); *Schmerling v. Injured Workers' Ins. Fund*, 368 Md. 434, 443, 795 A.2d 715, 720 (2002); *see Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001). In so doing, we must determine,

initially, whether a dispute of material fact exists. Md. Rule 2–501(e) (2002); *see Beyer,* 369 Md. at 359–60, 800 A.2d at 721; *Schmerling,* 368 Md. at 443, 795 A.2d at 720; *Lippert v. Jung,* 366 Md. 221, 227, 783 A.2d 206, 209 (2001). " 'A material fact is a fact the resolution of which will somehow affect the outcome of the case.' " *Matthews v. Howell,* 359 Md. 152, 161, 753 A.2d 69, 73 (2000) (quoting *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608, 614 (1985)). The facts properly before the court as well as any reasonable inferences that may be drawn from them must be construed in the light most favorable to the non-moving party. *Okwa v. Harper,* 360 Md. 161, 178, 757 A.2d 118, 127 (2000). If the record reveals that a material fact is in dispute, summary judgment is not appropriate. *See id.* If no material facts are disputed, however, we then must determine whether the Circuit Court correctly granted MTA judgment as a matter of law. *See* Md. Rule 2–501(e); *Beyer,* 369 Md. at 360, 800 A.2d at 721; *Schmerling,* 368 Md. at 443, 795 A.2d at 720.

### III. Discussion

A properly pleaded claim of negligence includes four elements. The plaintiff must allege " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' " *Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372, 395 (2002) (quoting *Valentine v. On Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947, 949 (1999) (quoting *BG & E v. Lane,* 338 Md. 34, 43, 656 A.2d 307, 311 (1995))). Although, generally, whether the plaintiff has presented adequate proof of these elements is a question for the fact finder, the existence of a legal duty ordinarily is a question of law to be decided by the court. *Valentine,* 353 Md. at 549, 727 A.2d at 949. This Court has defined "duty" in a negligence claim as " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *Muthukumarana,* 370 Md. at

486, 805 A.2d at 395 (quoting *Ashburn v. Anne Arundel County*, 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986)).

In this case, Mr. Todd argues that MTA had a duty as a common carrier to prevent foreseeable attacks on its passengers. By failing to take action to prevent his attack, which Mr. Todd urges was foreseeable, MTA breached this duty. Mr. Todd argues further that MTA's failure to take action to protect him after learning of the assault was also a breach of its duty.

MTA contends, however, that it had no duty to protect Mr. Todd from the juveniles because their attack was unforeseeable. In addition, MTA claims that, after learning of the attack, the bus driver's primary duty was to safely operate the bus and not to intervene in the ongoing attack on Mr. Todd. To resolve the parties' dispute, therefore, we must determine whether MTA had a duty to protect Mr. Todd from his assailants both before the attack began and while it was underway.[2]

### A. MTA's Duty of Care Under *Tall v. Baltimore Steam Packet Co.*[3]

A common carrier owes its passengers the highest degree of care to provide safe means and methods of transportation for them. *See MTA v. Miller*, 271 Md. 256, 259, 315 A.2d 772, 774 (1974); *St. Michelle v. Catania*, 252 Md. 647, 651, 250 A.2d 874, 876 (1969). We succinctly described this heightened duty in *MTA v. Miller*, 271 Md. at 259, 315 A.2d at 774 (1974):

> A common carrier is not an insurer of safety of its passengers, but it is bound to employ the highest degree of care for their safety, consistent with the nature of the undertaking. It owes its passengers a duty to deliver them to their

---

**2.** The parties do not dispute that MTA is a common carrier. Nor do they dispute that Mr. Rolle was acting as an employee of MTA when Mr. Todd's attack occurred.

**3.** 90 Md. 248, 44 A. 1007 (1899).

destination as expeditiously as possible, consistent with safety.

*See also Ragonese v. Hilferty*, 231 Md. 520, 526, 191 A.2d 422, 426 (1963); *Retkowsky v. Baltimore Transit Co.*, 222 Md. 433, 440, 160 A.2d 791, 794–95 (1960); *Smith v. Baltimore Transit Co.*, 214 Md. 560, 568, 136 A.2d 386, 391 (1957); *Tall*, 90 Md. at 253, 44 A. at 1008; *Baltimore & Ohio Railroad v. State*, 60 Md. 449, 462 (1883); *Baltimore & Ohio Railroad v. Worthington*, 21 Md. 275, 283 (1864); *Stockton v. Frey*, 4 Gill 406, 422–23 (Md.1846).

This high degree of care differs from the standard of care that we require of carriers in situations where a passenger suffered injuries as a result of a fellow passenger's assault. *Tall*, at 253–54, 44 A. at 1008. In such situations, this Court has held that a carrier has a duty to take affirmative action to prevent a foreseeable attack by one passenger upon another. *Pugh v. Washington Railway & Electric Co.*, 138 Md. 226, 113 A. 732 (1921); *Baltimore & Ohio Railroad Co. v. Rudy*, 118 Md. 42, 57, 84 A. 241, 247 (1912); *United Railways & Electric Co. v. State*, 93 Md. 619, 49 A. 923 (1901); *Tall*, at 253–54, 44 A. at 1008–09; *Baltimore & Ohio Railroad Co. v. Barger*, 80 Md. 23, 30–31, 30 A. 560, 561 (1894).

In *Tall*, this Court discussed the distinctions between the common carrier's two different duties:

[A common carrier's heightened duty of care], though the measure of the carrier's duty as between him and his passenger in respect to the acts or omissions to of the carrier and his servants towards the passenger, is not the standard by which his liability to the passenger is to be gauged or determined when intervening acts of fellow-passengers or strangers directly cause the injury sustained whilst the relation of passenger and carrier is subsisting. Such an injury, due in no way to defects in the means of transportation or to the method of transporting, or to an actual trespass by an employee whilst the relation of passenger continues and involving, therefore, no issues of negligence concerning the duty to provide safe appliances and

competent and careful servants to operate them, but arising wholly from the independent misconduct of a third party, furnishes a ground of action against the carrier only when the carrier, or his servants, *could* have prevented the injury but failed to interfere to avert it. The duty of the carrier in such instances is, consequently, relative and contingent, not absolute and unconditional. It springs from a condition, not of the carrier's but of a third party's creation, coupled with a knowledge by the carrier's servants that the condition exists, and with time enough intervening between the acquisition of the knowledge and the infliction of the injury to enable the servants of the carrier to protect the passenger from the third party's misconduct. (Emphasis in original.)

90 Md. at 253, 44 A. at 1008.

We continued by explaining the basis for a carrier's liability when one passenger assaults another:

The negligence for which, in such cases, the carrier is responsible is not the tort of the fellow-passenger or the stranger, but it is the negligent omission of the carrier's servants to prevent the tort from being committed. The failure or omission to prevent the commission of the tort, to be a negligent failure or omission, must be a failure or an omission to do something which could have been done by the servant; and, therefore, there is involved the essential ingredient that the servant had knowledge, or with proper care could have had knowledge, that the tort was imminent, and that he had that knowledge, or had the opportunity to acquire it, sufficiently long in advance of its infliction to have prevented it with the force at his command. If this were not so, the mere tort of a fellow-passenger or a stranger would constitute of itself, the negligence of the carrier, and the carrier would be held answerable for wrongful acts of a third party, though the carrier's servants were, without fault, ignorant of the third party's purpose to make an assault and were, consequently, unprepared to avert it. Such a rule would make the carrier an absolute insurer of the safety of the passenger against the wrongful conduct of third persons, though, as between the carrier and

the passenger in ordinary cases, the carrier's liability is made to depend on his or his servant's negligence.

*Id.* at 253–54, 44 A. at 1008–09.

■ *Tall* has established clearly that common carriers owe a duty to take affirmative action to protect their passengers from an assault by a third party if certain conditions are present. The existence of the duty depends, first, on whether the carrier, in the exercise of proper care, knew or should have known that an assault was imminent. Even if the carrier had the requisite knowledge, its duty to take protective action does not arise unless that duty arose well enough in advance of the assault to have prevented it with the force in its command.

Although whether one party owes a duty of care to another is ordinarily a legal question for the court to decide, the existence of MTA's duty in this case is predicated on its asserted similarity (or not) to the factual conditions prerequisite described in *Tall.* Because the jury is the appropriate body to find the facts, we need only decide if there is a dispute of material facts as to whether these conditions existed in the present case. *Cf. Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 693, 762 A.2d 582, 608 (2000) (recognizing that the existence of a legal duty may depend on a preliminary factual determination, namely whether contractual privity existed, which should be decided by the trier of fact). Mr. Todd presented such a factual dispute regarding MTA's duty if a jury could reasonably find: (1) that MTA knew or should have known that the attack on Mr. Todd was imminent, and (2) that it knew or should have known of the imminent harm with adequate time and available resources to have prevented or mitigated it. *See Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 738–39, 625 A.2d 1005, 1011 (1993) (requiring "evidence upon which the jury could reasonably find for the plaintiff" to create a material dispute of fact).

### 1.

Several early Maryland cases provide guidance for determining the existence of the first factual threshold, whether an

attack by a passenger upon another was foreseeable. In *Tall*, we affirmed a judgment in favor of a steamboat company, holding that it did not owe a duty to protect its passenger from an unexpected gunshot injury. 90 Md. at 256, 44 A. at 1009. The facts indicated that the passenger's gunshot wound was the unfortunate result of a quarrel between two other passengers in the boat's smoking room. *Id.* at 251, 44 A. at 1008. The quarreling passengers exchanged unpleasant words while the captain of the boat looked on. *Id.* Just as the quarrel turned physical, the captain "sprung forward ... and intervened" but could not prevent one of the quarrelers from firing a gun at the other. *Id.* The bullet missed its target and hit the plaintiff, who was standing some distance away. *Id.* We concluded that, as a matter of law, the steamboat captain could not have foreseen that a quarrel between two passengers would result in a gunshot injury to a third party who was not at all involved in the argument. *Id.* at 256, 44 A. at 1009.

This Court again considered the duty of a common carrier to protect its passenger from foreseeable assault in *United Railways*, 93 Md. at 623–24, 49 A. at 923. We held in that case that the plaintiff had presented sufficient evidence to create a jury question concerning whether the carrier should have foreseen the attack on the injured passenger and, thus, owed him a duty to take preventive measures. *Id.* at 629, 49 A. at 926. Before the attack, the assailant had been forcibly ejected from the street railway car by the defendant's agents because he was drunk and acting violently. *Id.* at 627, 49 A. at 925. The violent passenger immediately boarded the car again, however. *Id.* Although the motorman and conductor saw the passenger board the car for the second time, they failed to take action to remove him before he attacked again. *Id.* The railway company argued that it could not have foreseen that the plaintiff's decedent, in particular, would be attacked by the violent passenger. *Id.* at 627–28, 49 A. at 925. We emphasized, though, that a common carrier's duty extends to the protection of all passengers in its care, and if the defendant had knowledge that "*some* one would (or might) be

injured," it had a duty to protect all passengers from that danger. *Id.* at 628, 49 A. at 925. The railway company, we concluded, had a duty to take action to prevent the attack because the assailant's known "condition . . . rendered it very probable and likely that he would attack someone else." *Id.*

In *Baltimore & Ohio Railroad Co.*, 118 Md. at 65, 84 A. at 250, this Court held that an injured passenger had created a jury question as to whether the defendant railroad company should have known that an assault upon a passenger was imminent. The injured passenger presented evidence that, for an extended period prior to the his injury, the railroad company knew that other passengers on its train were drinking, "boisterous," "swearing," and throwing glass bottles out of the train window. *Id.* at 59–60, 84 A. at 248. The injured passenger testified that one of the thrown bottles shattered on a passing train, and a shard from it rebounded into the defendant's train, causing the injury. *Id.* Based on this evidence, we concluded that it was proper for the jury to decide whether the defendant should have known that the disorderly passengers' conduct placed other passengers in danger. *Id.* at 65, 84 A. at 250.

In *Pugh v. Washington Railway & Electric Co.*, 138 Md. 226, 234–36, 113 A. 732, 736 (1921), we held as a matter of law that the defendant railroad company could not have foreseen an assault upon its passenger. The plaintiff was seated beside her sister on the defendant's passenger train. *Id.* at 227–28, 113 A. at 733. Immediately across from and facing the plaintiff and her sister were the assailant and a deputy sheriff. *Id.* When the assailant reached out and grabbed the plaintiff's knee, the plaintiff immediately told the him to stop. *Id.* at 234–35, 113 A. at 735. Although the train conductor stood nearby, the plaintiff did not bring the incident to his or the deputy sheriff's attention. *Id.* The assailant then grabbed the plaintiff's knee a second time, causing the injury for which the railroad company was later sued. *Id.* at 229, 113 A. at 733–34. We held that the plaintiff had presented no evidence to show that the railroad company knew or should have known that the assault was imminent because "there was nothing in

the conduct of the [assailant] to excite the apprehension of even those sitting beside him [on the train] that he contemplated such an assault." *Id.* at 234, 113 A. at 735.

In all of these cases, we have recognized that the assailant's prior conduct was significant in our determination of whether a future assault was foreseeable. That is, the carrier knew or should have known that an attack on its passenger was foreseeable when the assailant, prior to the attack, had behaved recklessly, violently, or disorderly.

■ We hold that, in the instant case, Mr. Todd presented sufficient evidence upon which a jury could reasonably find that the attack on Mr. Todd was foreseeable. Like the assailants in *United Railways* and *Baltimore & Ohio Railroad*, the juveniles who boarded the bus were disruptive and unruly. The juveniles "irritated" and "cursed" other passengers. Their manners were such that they caused other passengers to complain to Mr. Rolle. These actions were even more foreboding because the group of juveniles all behaving this way numbered fifteen to twenty. The size of the group and the nature of their conduct, without more, could have alerted Mr. Rolle to the likelihood of an altercation. Therefore, we find that the facts before us create a jury question as to whether MTA should have known, in the exercise of reasonable care, that an assault on its passenger was imminent.

## 2.

Turning now to the second inquiry under the *Tall* rule, we must determine whether a jury could find that the driver knew of the attack far enough in advance to have prevented it with the force in his command. Two of the cases we discussed above instruct us as to the sufficiency of the evidence under this inquiry. In *United Railways*, we held that the carrier knew of the assailant's dangerous propensities with adequate time before the passenger's attack to have prevented it. 93 Md. at 628, 49 A. at 925. The carrier's agents, who had already demonstrated their ability to eject the violent assailant, noticed the assailant again board the street railway car.

*Id.* at 627, 49 A. at 925. Thereafter, the street railway car made at least two stops, but no effort was made to put the assailant off the car. *Id.* We held that this evidence was sufficient for a jury to find that the carrier had the time and ability to have prevented the victim's injury. *Id.* at 629, 49 A. at 925.

Similarly, in *Baltimore & Ohio Railroad,* we held that the jury could find that the carrier knew of the reckless activity on the train with enough time to have prevented it. 118 Md. at 65–67, 84 A. at 250. The facts presented showed that the assailant's reckless conduct began and continued throughout a train ride from West Virginia to Washington D.C. *Id.* at 58–59, 84 A. at 247. On the return trip to West Virginia, the assailants resumed the disorderly behavior for a period of thirty-five to forty minutes and in the presence of one of the carrier's agents. *Id.* at 59–62, 84 A. at 248–49. This evidence, we decided, provided a jury with a basis for finding that the carrier had ample time protect the plaintiff after it knew of the reckless conduct. *Id.* at 64–65, 84 A. at 250.

The facts in the instant case also could persuade a jury to conclude reasonably that the MTA bus driver had sufficient time within which to take action to remove the threat of the assault. The bus driver knew of the juveniles' behavior when they boarded the bus and began to "irritate" and "curse" other passengers. Like in *United Railways* and *Baltimore & Ohio Railroad,* the attack did not commence suddenly after the carrier learned of the danger to his passengers. Rather, the unruly behavior of the juveniles continued for five minutes before Mr. Todd was struck in the back of the head. Furthermore, Mr. Rolle arguably possessed within his command the necessary force to have prevented the attack, whether it involved requesting the juveniles to behave, pushing the panic button or stopping the bus. In our judgment, a jury could reasonably conclude that a five minute period provided the bus driver with enough time to take some affirmative action to prevent the assault.

Consequently, Mr. Todd met both criteria for creating a jury question over the existence of MTA's duty under *Tall.* The evidence showed that MTA had knowledge that the assault upon Mr. Todd was imminent. It further demonstrated that this knowledge existed far enough in advance of the assault for MTA to have taken preventative action.

### B. MTA's Duty to Render Aid to Mr. Todd

For an appropriate resolution to this case, we also must look beyond the rule in *Tall.* Mr. Todd argues that MTA's duty to take action arose, not only when the attack became foreseeable, but also upon learning that the attack on Mr. Todd was underway. In other words, Mr. Todd contends that Mr. Rolle had a duty to provide aid to Mr. Todd after learning that the attack had commenced. We agree.

Although this Court has not before confronted the issue of a common carrier's duty to aid a passenger under attack, we addressed an analogous scenario in *Southland Corp. v. Griffith,* 332 Md. 704, 633 A.2d 84 (1993). In *Southland,* we reversed summary judgment for the owner of a convenience store whose customer, Griffith, was assaulted by a group of teenagers in the store's parking lot. *Id.* at 720, 633 A.2d at 92. While the attack was ongoing, Griffith's son notified the store clerk of the altercation and asked her to telephone the police. *Id.* at 709–10, 633 A.2d at 86. Evidence showed that the clerk failed to promptly comply with the son's request, prolonging the assault and causing injury to Griffith. *Id.*

In analyzing whether the store owner had a duty to aid a customer in peril, we recognized as a general principle that:

> Absent statutes to the contrary, or the existence of a legally cognizable special relationship, the law is clear that a person has no legal duty to come to the aid of another in distress, even if the aid can be provided at no risk or cost to the other person.

*Id.* at 716, 633 A.2d at 90 (citing *Lamb v. Hopkins,* 303 Md. 236, 242, 492 A.2d 1297,1300 (1985)). We also observed that there are a number of " 'special relationship' exceptions to this

general common law rule, which give rise to a duty to render aid." *Southland,* 332 Md. at 717, 633 A.2d at 90. Among these relationships, we found, are shopkeeper to business visitor and common carrier to passenger. Expressly adopting Section 314A of the *Restatement (Second) of Torts* (1965), we embraced the following proposition:

> [A]n employee of a business has a legal duty to take affirmative action for the aid or protection of a business invitee who is in danger while on the business's premises, provided that the employee has knowledge of the injured invitee and the employee is not in the path of danger.

*Southland,* 332 Md. at 719, 633 A.2d at 91. We then applied this rule to the facts in *Southland* and held that the convenience store clerk "owed [Griffith] a legal duty to aid (call the police) when he requested assistance." *Id.* at 720, 633 A.2d at 91.

The business owner's duty to aid its customers applies with equal force to common carriers in relation to their passengers. Indeed, Section 314A of the *Restatement (Second) of Torts,* from which this Court derived the rule in *Southland,* includes the common carrier to passenger relationship among the special relationships that give rise to a duty to aid.[4] Thus, an employee of a common carrier has a legal duty to take affirmative action for the aid or protection of a passenger who is in danger, provided that the employee has knowledge of the

---

**4.** *Restatement (Second) of Torts* § 314A (1965) states in its entirety:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>> (a) to protect them against unreasonable risk of physical harm, and
>> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
>
> (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

injured passenger and the employee is not in the path of danger.

Viewing the evidence in the present case favorably to Mr. Todd, a jury could reasonably find that Mr. Rolle heard a passenger yell, "Bus driver, stop the bus. They are beating up this man back here. Stop the bus." A jury also could reasonably find from this evidence that Mr. Rolle acquired knowledge that a passenger was being injured. Such a finding, therefore, would establish that Mr. Rolle had a duty to take affirmative action to aid Mr. Todd.

### C. Breach of Duty

MTA asserts that Mr. Rolle met his duty to protect Mr. Todd by pulling to the curb and pressing the bus's "panic button" minutes after the assault commenced. To determine, as a matter of law, that Mr. Rolle's actions satisfied the required standard of care would be inappropriate, however. This is especially true in light of our opinion in *Maryland & Pennsylvania Railroad Co. v. Knight,* 122 Md. 576, 89 A. 1091 (1914), in which we recognized that a carrier's employees "should be prompt to act" in carrying out their duty "in quelling quarrels between drunken and disorderly passengers." *Id.* at 581, 89 A. at 1093.

In resolving controversies like the one before us, other jurisdictions have allowed the fact finder to determine whether the carrier acted within the standard of care. The Illinois Supreme Court, applying a rule comparable to the one announced in *Tall,* faced a case factually similar to the present in *Watson v. Chicago Transit Authority,* 52 Ill.2d 503, 288 N.E.2d 476 (1972). That case involved a bus driver who drove four city blocks after he learned of an altercation on the bus. *Id.* at 477. The carrier argued that the driver acted reasonably as a matter of law because the driver continued until he could stop near a parked police car. *Id.* at 478. The court held, however, that the jury should decide whether the driver's behavior met his duty to " 'exercise the degree of care and vigilance practicable under the circumstances to prevent the

injury.' " *Id.* (quoting *Letsos v. Chicago Transit Authority,* 47 Ill.2d 437, 265 N.E.2d 650, 653 (1970)).

In *Finken v. Milwaukee County,* 120 Wis.2d 69, 353 N.W.2d 827, 831 (App.1984), the Wisconsin Court of Appeals upheld a jury's finding that common carrier breached its duty to take action to stop an ongoing assault on its passenger. At trial, witnesses testified that a "loud and rambunctious" group of twenty youths boarded a public bus and demanded money from another young passenger. *Id.* at 829. When that young passenger, the plaintiff, refused their demand, members of the unruly group began "hitting him about the face and head." *Id.* During the assault, the victim pulled the bus's buzzer cord to alert the driver to the trouble and "saw the driver watching the commotion in the rearview mirror." *Id.* The evidence showed that the driver failed to take any action to stop the assault. *Id.* In upholding the jury verdict against the bus company, the court described its reasoning:

> The jury could reasonably infer from [the] testimony that the bus driver had reason to anticipate an act by the youths directed at other passengers or, at the very least, had reason to know during the course of the assault that one of her passengers was experiencing trouble. In either case, the jury could reasonably find that her failure to act before or during the assault was negligent and that her negligence caused the injuries [to the plaintiff]. It was reasonable to infer, for example, that the assault would not have occurred had the driver ordered the youths off the bus for their rowdiness, warned them, or notified them she was summoning the police.

*Id.* at 831.

In *Hanback v. Seaboard Coastline Railroad,* 396 F.Supp. 80, 90 (D.S.C.1975), the United States District Court applied South Carolina law to hold a common carrier liable for the injuries of a passenger who was raped by another passenger. Trying the case without a jury, the court found, as a matter of fact, that an employee of the carrier "heard four screams" but "took no action as a result of the screams, although she knew

that the ladies lounge was next to her compartment." *Id.* at 83–84. The court concluded the carrier's employee "was put on notice by the screams that someone in the ladies lounge was in acute distress and in need of assistance." *Id.* at 90. As for the employee's duty, the court stated that she need not "risk her life by confronting the rapist and attempting to rescue a female passenger from his clutches," but "the law certainly requires that she take some action and seek male assistance from other train personnel in investigating the cause of the screams." *Id.* The employee's failure to take action, the court held, caused "the plaintiff's ordeal [to be] prolonged and her injuries [to be] increased." *Id.*

Like the plaintiffs in these cases from other states, Mr. Todd presented facts from which a reasonable jury could conclude that Mr. Rolle, while apparently acting in accordance with the MTA directive, breached its duty to take appropriate protective action.[5] For instance, factual questions exist with respect to how much time had passed from when Mr. Rolle learned of the attack and when he eventually took action to protect Mr. Todd. Mr. Rolle testified in his deposition that he first learned of the attack when the bus was still crossing the Orleans Street Bridge. He could not estimate how long he spent maneuvering the "creeping" bus across the traffic-congested bridge until finally stopping on Saint Paul Street, when Mr. Rolle first pushed the panic button, opened the bus doors, and allowed the attackers to flee. Mr. Todd testified, though, that the group of disorderly juveniles boarded the bus five minutes before they attacked him and that the attack on his person continued for four to five minutes. A view of this testimony in the light most favorable to Mr. Todd reveals that

---

5. We question whether MTA adequately prepared Mr. Rolle to respond to an assault on a passenger. MTA's directive forbade its bus operators from physically intervening under any circumstances, instructing them, instead, only to press the panic button and wait for assistance. According to MTA's corporate designee, the directive provided bus drivers with no other guidance as to what action to take when a passenger is assaulted. This relative lack of direction, itself, may have contributed to Mr. Rolle's alleged failure to take appropriate action in Mr. Todd's defense.

Mr. Rolle drove the bus through stationary traffic for up to ten minutes without responding to a known danger to a passenger.

A reasonable inference could be drawn from these facts that, because no cars were moving on the bridge, Mr. Rolle could have stopped the bus as soon as he learned of Mr. Todd's peril without risking the safety of the passengers. It is a reasonable inference, moreover, that had Mr. Rolle stopped, pushed the panic button, and opened the bus doors immediately, the attackers could have fled at once. Whether Mr. Rolle's failure to take this action before he did constituted a breach of MTA's duty of care is a question for the jury.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPEL-LEE.*

Concurring Opinion by HARRELL, Judge, in which RAKER and CATHELL, Judges, Join.

I join in the Majority opinion's analysis and holding regarding the triable basis of MTA's duty owed to Todd as set forth in its Part III(B) (Maj. op. at 164–66, 816 A.2d at 938–39) and the Majority's breach of duty analysis and holding in Part III(C) of the opinion (Maj. op. at 166, 816 A.2d at 940), except as explained *infra* to the contrary. Accordingly, I join in the judgment of the Court. I am unable, however, to accept the Majority's application of our prior cases on this record to reach the result it does based on Part III(A)(1) and (2) of the Court's opinion. I explain.

Part III (A)(1) of the Majority opinion (op. at 159–62, 816 A.2d at 936–37) presents the foreseeability element of its *Tall*[1] analysis, concluding that the creation of a duty owed to Todd to protect him from the attack or to mitigate its duration arose in the present case from the moment the youths boarded the

---

1. *Tall v. Baltimore Steam–Packet Co.*, 90 Md. 248, 44 A. 1007 (1899).

bus and became "disruptive and unruly" and "irritated" and "cursed" the passengers in the front of the bus. The Majority reaches this conclusion after presenting the facts of prior cases where various scenarios were found to create (or not create) triable issues as to foreseeability. I am not persuaded that the record in the present case, even when viewed in a light most favorable to Todd as the non-moving party, rises to the level of the factual scenarios in those prior cases where foreseeability was recognized as a triable issue. More telling, however, the facts of the present case are even less compelling than in the prior cases where the issue was found *not* to be triable.

In *Tall,* where the issue of foreseeability was deemed *not* triable, evidence was adduced that a quarrel broke out between two passengers on a steamboat who exchanged unpleasant words while the boat's captain looked on. *Tall,* 90 Md. at 251, 44 A. at 1008. As the quarrel became physical, the captain, by then perceiving a need to intervene, attempted to do so, but could not before a shot fired inaccurately by one combatant injured an innocent bystander. *Id.* at 256, 44 A. at 1009.

By contrast in the present case, Todd claimed not to have said a word to his attackers before the attack. There was no evidence of the physical manifestation of a threat or aggression toward any passenger prior to the attack on Todd. At best, the record of this case depicts, in conclusory and generalized fashion based on Todd's deposition testimony, that the youths "starting irritating passengers," were "cursing them, disrespecting them, you know, [using] foul language." Todd did not indicate whether these verbal diatribes contained fighting words, physical threats, or other words predictive of possible physical acting-out. No inference may be drawn as to what was said. Moreover, Rolle, the bus driver (the "captain of the ship" if you will), could not have seen the confrontation between the youths and Todd when they reached Todd's location at the rear of the crowded bus as, by the admission of both Todd and Rolle in their depositions, neither could see

across the length of the bus [2] due to the passenger-congested aisles and seating on the overloaded bus. Accordingly, the facts revealed at the time summary judgment in the present case, seem even thinner on the issue of foreseeability than those found wanting in *Tall.*

In *United Railways & Electric Co. v. State*, 93 Md. 619, 49 A. 923 (1901), where the facts were found to create a triable issue as to foreseeability, the defendant's agents were aware of the assailant's lack of sobriety and that he had been acting violently on the train, having earlier ejected him forcibly from the train for those reasons. *Id.* at 627, 49 A. at 925. Yet, those same agents took no similar action when the future assailant rather promptly reboarded the train. *Id.* The physicality of the assailant's earlier conduct, coupled with the contemporaneous appreciation of it by the defendant's agents, convinced the Court that the subsequent injury to the plaintiff, a passenger toward whom the assailant manifested no prior animus, was triable as to foreseeability because the facts "rendered it very probable and likely that [the assailant] would attack someone else." *Id.* The recipe for predicative possible violence in *United Railways* satisfied the Court because of the physicality of the assailant's earlier conduct, i.e., drunk and acting violently. In the present case, we have not a clue as to whether the youths, other than being verbally rude and crude, said anything suggestive of possible violence. Although the Majority appears to attach additional significance to the size of the group (Maj. op. at 162, 816 A.2d at 937), I do not view that as sufficient, in combination with unknown profane words, to generate a triable issue as to the foreseeability of possible violence.

Similarly, in *Baltimore & Ohio Railroad Co. v. Barger*, 80 Md. 23, 30 A. 560 (1894) (triable issue presented where railroad employees were alleged to have known of drinking passengers throwing glass bottles from train window) and *Pugh v. Washington Railway & Electric Co.*, 138 Md. 226, 113

---

**2.** Todd was seated in the rear of the bus, in front of the rear exit.

A. 732 (1921) (no triable issue where evidence showed assailant twice grabbed victim's knee twice, injuring her the second time, while train conductor stood nearby but unaware of conduct), the facts at least involved elements of offensive physical conduct. The present record lacks any such basis. Although the Majority opinion accurately describes the behavior in the early cases as being "reckless[ ], violent [ ], or disorderly" (Maj. op. at 162, 816 A.2d at 937), it fails to persuade me that the evidence in the present case solely of the use of irritating or swearing language, standing alone, by all or some of 15 to 20 youths rises to a triable issue of foreseeability, e.g., that Rolle should have known from this' conduct during the initial five minutes after the youths boarded the bus that some of the youths later would attack physically Todd or any other passenger.

Part III (A)(2) of the Majority opinion (op. at 162–64, 816 A.2d at 937–38) addresses the question of the reasonableness of the time for Rolle to act and assumes that his duty arose at the time the youths entered the bus. I do not agree, given the explanation *supra* of my views on Part III(A)(1) of the Majority opinion as to foreseeability, that there was a triable issue as to this factor for much the same reasons. It was not until Rolle was informed by a passenger in the front of the bus that the youths had commenced to batter Todd (*see.* Part III(B) of the Majority opinion) that any possible duty arose. It is from that point until when the bus was brought to a stop, some 4–5 minutes after the physical assault began, that a fact-finder should evaluate whether Rolle had time to act and whether what he did (or did not do) was reasonable under all of the relevant circumstances.

Judges RAKER and CATHELL have authorized me to state that they join this concurrence.